525 F.2d 760
 UNITED STATES of America for the Use and Benefit of H & S
INDUSTRIES, INC., as Assignee of Cass County Stone
Corp., et al., Plaintiffs-Appellants,
v.
F. D. RICH CO., INC., and Transamerica Insurance Co.,
Defendants-Appellees.
UNITED STATES of America for the Use and Benefit of H & S
INDUSTRIES, INC., as Assignee of Cass County Stone
Corp., et al., Plaintiffs-Appellees,
v.
F. D. RICH CO., INC., Defendant-Appellant.
F. D. RICH CO., INC., Plaintiff-Appellee,
v.
UNITED STATES FIDELITY & GUARANTY, Defendant-Appellant.
 Nos. 74--1670, 74--1687 and 74--1700.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 3, 1975.
Decided Oct. 16, 1975.
Rehearings and Rehearings En Banc
Denied Nov. 17, 1975.
 
 George E. Buckingham, Goshen, Ind., Robert L. Miller, South Bend, Ind., for H & S Ind.
 Thomas M. Shoaff and N. Reed Silliman, Fort Wayne, Ind., for F. D. Rich Co.
 James W. Riley, Jr., Indianapolis, Ind., for U. S. Fidelity & Guaranty.
 Before CUMMINGS and PELL, Circuit Judges, and PERRY, Senior District Judge.*
 PELL, Circuit Judge.
 
 
 1
 The United States of America contracted with the F. D. Rich Co., Inc., (Rich) as general contractor to build a 200 family housing project at Bunker Hill (now Grissom) Air Force Base near Kokomo, Indiana. Transamerica Insurance Co. was surety of Rich for the benefit of the United States. Cass County Stone Corp. (Cass) was a subcontractor of Rich who was, inter alia, to clear and grade the site to specifications, install a storm drainage system, and prepare the ground in the form of building pads on which a foundation and a concrete slab would be poured by others. United States Fidelity and Guaranty Company (USF&G) was surety of Cass for the benefit of Rich. H & S Industries, Inc., (H & S) is the assignee of Cass of all Cass's claims against Rich.[1]
 
 
 2
 The housing project could scarcely be characterized as other than a disaster for all concerned parties. It was scheduled to be completed by July 4, 1970, but was not accepted by the government until July 27, 1973. Rich experienced a loss of over a million dollars even though the contract price was only $3,360,000. Cass abandoned the project before completing its work, alleging nonpayment of amounts due from Rich, and later filed suit against Rich for these amounts and other damages. Rich counterclaimed for damages alleging breach of the subcontract by Cass.
 
 
 3
 After a lengthy bench trial, the district court issued a thirty-one page (unpublished) memorandum carefully setting forth its findings and conclusions. It found that Cass failed to complete its work on the building pads until 292 days after the date Rich scheduled their completion. It found Rich's schedule was within its authority as provided in the contract and that the time provided was within industry standards. The court further found that the delay resulted in 292 days delay to the entire project because the building pads were on the critical path of the project; viz., no work could be done by other trades on the buildings until the ground was compacted so that concrete slabs could be poured on which the buildings would be built. The court found:
 
 
 4
 '(Cass) did not prosecute its work under the subcontract diligently and did not maintain sufficient men and equipment forces to prosecute the various segments of its work simultaneously under the subcontract irrespective of the extra work and materials required by the contractor as recited above. The subcontractor was under financed to meet its obligations under the subcontract. When one segment of its work proceeded, the other lagged, and when a shift was made to any new area of its obligations under the subcontract, it caused the preceding areas of work to dissipate or cease entirely. The subcontractor failed to complete any of its work items within the time required by the original contract schedule of which the subcontractor was fully informed at all pertinent times.'
 
 
 5
 Nevertheless the court found that Rich caused one-half (146 days) of this delay by failing to place rock on the subgrade for the road through the project to provide temporary access during construction. Placing this rock on the road would also have enabled water to drain from the construction site. A major problem throughout the construction period was pooling of water.
 
 
 6
 In accordance with these findings, damages were awarded against Cass and its surety for causing 146 days delay to Rich. Damages were also awarded against Cass for certain payments made to Cass and to Cass subcontractors who had not been paid, for payments made to Cass subcontractors to complete subcontract work, and for deficiencies charged by the government against Rich. Cass was allowed to set off the cost of repairing damages by Rich to Cass's work and payment for work requested by Rich which was in addition to the work indicated in the subcontract. The details of these awards are set out in the first column of figures of Schedule A appended to this opinion.
 
 
 7
 Following entry of judgment and amendment to that judgment, USF&G and H & S for the benefit of Cass appealed; Rich cross-appealed.
 
 I. Propriety of Cross-Appeal
 
 8
 Cass, by motion, requested Rich's cross-appeal be dismissed on the grounds that Rich had accepted benefits of the judgment in its favor. Following entry of the judgment, counsel for each party signed an agreement entitled 'Waiver of Costs and Limited Waiver of Interest.' Cass now alleges that the attorney who signed the agreement was not authorized to do so and that this attorney no longer represents Cass. The attorney who signed the agreement had been Cass's attorney at trial. We need not decide whether this attorney had actual or apparent authority to bind Cass or whether his lack of authority affects the validity of the agreement as it applies to Rich because of our interpretation of the agreement.
 
 
 9
 The parties first dispute whether federal law or Indiana law should be applied to determine Rich's right of appeal. Cass argues that Indiana law should be applied relying generally on Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Also in Moser v. Buskirk, 452 F.2d 147 (7th Cir. 1971), this court accepted and commented favorably on a stipulation of counsel in a diversity case which followed Indiana law and indicated that acceptance of benefits of a judgment precludes an appeal. There is no indication in Moser that the question of which law to apply was argued or considered. It is by no means certain that this is the law of Indiana today.[2]
 
 
 10
 In Dorin v. Equitable Life Assurance Society, 382 F.2d 73 (7th Cir. 1967), this court was faced with a clear issue of whether Erie controlled a question which was closely analogous to the one at bar. In Dorin, a cross-appeal was filed after remittitur was accepted. Under the circumstances of that case, Illinois law would have allowed the appeal but federal law would not. Relying on Hanna v. Plumer, 380 U.S. 460, 468, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), this court held that the aims of Erie--discouragement of forum shopping and avoidance of inequitable administration of the laws--would not be served by applying state law to a problem of procedure which would arise, if at all, after completion of trial. The same rationale applies in this case, and we therefore hold that federal law applies.
 
 
 11
 In United States v. Hougham, 364 U.S. 310, 81 S.Ct. 13, 5 L.Ed.2d 8 (1960), the Supreme Court stated:
 
 
 12
 'It is a generally accepted rule of law that where a judgment is appealed on the ground that damages awarded are inadequate, acceptance of payment of the amount of the unsatisfactory judgment does not, standing alone, amount to an accord and satisfaction of the entire claim.' Id. at 312, 81 S.Ct. at 16.
 
 
 13
 Cass argues that the preclusion rule still has vitality and attempts to distinguish Hougham on the grounds that in the case before us the acceptance did not stand alone. The Ninth Circuit correctly states current law in Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co. Inc., 414 F.2d 750 (9th Cir. 1969):
 
 
 14
 '(W)hen a party accepts the benefits of a judgment under circumstances which indicate an intention to finally compromise and settle a disputed claim, an appeal may be foreclosed. In such a case, it is '* * * the mutual manifestation of an intention to bring the litigation to a definite conclusion upon a basis acceptable to all parties' which bars a subsequent appeal, and not the fact, standing alone, that benefits under the judgment were accepted. Gadsden v. Fripp, 4 Cir., 330 F.2d 545, 548.' Id. at 752.
 
 
 15
 A similar rule is advocated in 9 Moore's Federal Practice $203.06 at 719 (1973).
 
 
 16
 By its terms, the agreement in this case waived taxable costs and post-judgment interest after April 24, 1974, if a specified amount was paid prior to May 5, 1974. It has not been demonstrated that the agreement and payment thereunder was anything other than what it purported to be, i.e., a device whereby one who was then obligated under a judgment would be payment of the amount of the judgment avoid the payment of the costs which would be taxed on the judgment plus stopping the accruing of interest on a judgment which both the payor and the payee contemplated appealing, and did in fact appeal. We find no basis in the record for considering this not unusual arrangement to be a final compromise and settlement of claims which obviously were still in dispute.[3] The motion to dismiss Rich's appeal is denied.
 
 II. Verbal Exchanges with Counsel
 
 17
 Appellants urge that the district court judge committed error or abused his discretion in three instances during the trial and therefore that a new trial should be ordered. In these instances, it is asserted either the trial judge talked counsel out of objections to evidence, which may or may not have been technically correct but for which he saw no strategic purpose, or he insistently encouraged stipulations on issues which he did not consider seriously in dispute.
 
 
 18
 A jurisprudential argument might be made that it is better practice for a trial judge to allow counsel to decide what objections and stipulations to make and confine himself to legal rulings. On the other hand, a practical argument can be made that pressure from the court to settle minor issues is necessary in the interest of litigation time economy. Certainly, a simplification of complex issues would not seem to hinder a quest for the truth. In the context of this lengthy trial, the transcript of which covers in excess of 1800 pages, we find no such abuse of discretion as to require a new trial. In no event should counsel have withdrawn an objection or made a stipulation if he felt the point was critical to his case; he should have explained why it was important. The trial judge's actions were not one-sided; his firm handling of the course of the trial was even-handed and he expressed his views to counsel for both sides at various points during the trial.
 
 
 19
 One of the points raised regarding the conduct of the trial is closely tied to the correctness of the trial court's determination of damages and will be discussed in Part IV.A.4., infra.
 
 
 20
 III. Contractual Responsibilities for Temporary Roads
 
 
 21
 Two references are made in the project specifications to temporary roads. These specifications were incorporated into the contract between Rich and the Government; these in turn were incorporated by reference into the subcontract between Rich and Cass although Cass was only responsible by the terms of the subcontract for performing certain sections of the specifications. Neither section on temporary roads is a section for which responsibility explicitly had been delegated to Cass. The first requires Rich to construct any access roads needed to get to the construction site. Rich instructed Cass to build such a road, and a claim for payment for that road was initially an issue in this lawsuit. Partial judgment was granted for Rich on this issue because the evidence showed that the parties had earlier reached an agreement regarding this work. No appeal was taken from this order.
 
 
 22
 The second reference treats temporary roads within the construction site. It provides:
 
 
 23
 '(A) General: The Contractor shall be responsible for the roads in his work area and shall at his sole expense:
 
 
 24
 (2) Provide and maintain new access roads required by him.'
 
 
 25
 As indicated previously, the district court found that Rich had breached its duty to provide temporary access by rocking the road subgrades. The court further found that the rocking had to have been coordinated with the installation of the drainage system by Cass or the storn swewer inlets would be elevated above the unrocked roadways and the sewer pipes would have a tendency to clog with silt and debris. The above facts and provisions standing alone would be persuasive that the district court's judgment on this issue was correct. However, they do not stand alone. Article XXVII of the Rich-Cass subcontract provides:
 
 
 26
 '. . .
 
 
 27
 'The second party (Cass) hereby distinctly and expressly declares and acknowledges that before signing this contract it has carefully read the same and the whole thereof together with and in connection with said plans and specifications; that it has made such examination of this contract and of said plans and specifications, and the location where said work is to be done, as to enable it to thoroughly understand the intention of the same, and the requirements, covenants, agreements, stipulations and restrictions contained in this contract, and the general contract and in said plans and specifications; and distinctly agrees that it will not hereafter make any claim or demand upon the first party, based upon or arising out of any alleged misunderstanding or misconception on its part of the said requirements, covenants, stipulations and restrictions; . . . and second party will not make any claim for delay or damage by reason of the condition of the site, roads or utilities and first party (Rich) shall not be responsible for difficulty of access and shall not be required to provide access to the site or any part thereof.' (Emphasis added.)
 
 
 28
 The effect of this article is to shift the risk of difficulty in access, which was placed on Rich by the General contract, to Cass. Rich cannot be held responsible for delaying Cass 146 days for failing to rock or otherwise provide temporary access roads. The district court's findings of breach by Rich also included reference to the failure of coordination on the part of the general contractor. However, it appears clear from the record that central to any claim of Cass that its delay in adhering to the schedule was attributable to Rich, rather than its own fault, was the lack of access roads. When that basis of the claim falls, the coordination prong, pendent to it, also falls. Failure to coordinate a matter as to which with relation to Cass it had no duty to perform is as to Cass no failure at all. Cass therefore must bear the full responsibility for the 292 days delay except as damages are otherwise modified in this opinion. The effect of this holding on damages is shown in Schedule A appended to this opinion. Specific items of damage are discussed in Part IV, infra.
 
 
 29
 We note that Judge Beamer of the Northern District of Indiana in an unpublished opinion reached the same interpretation of this contract as we reach. The case involved a different plaintiff but the language of the contract between Rich and the plaintiff was identical to the language in this contract except with respect to the work to be done. United States for the use of Henry Construction Co., Inc. v. F.D. Rich Co., Civ. No. 71 S 87, May 10, 1974.
 
 
 30
 Appellants argue that Rich is foreclosed from relying on Article XXVII because it was not pleaded by Rich as an affirmative defense under Fed.R.Civ.P. 8(c). This argument is without merit. The issue is a matter of interpreting the contract between Rich and Cass. The contract must be read as a whole. Article XXVII is not a separate agreement reached by the parties after breach.
 
 
 31
 Appellants also argue that this Article should not be considered because it was not argued to the district court. Apparently it was not stressed before the district court to the extent it was before this court, but it was cited by Rich's attorneys several times. Also the entire subcontract was incorporated by reference into the opinion of the district court. We cannot ignore Article XXVII.
 
 
 32
 Because we find no breach by Rich in relation to Cass, we need not consider whether it was proper for the district judge to award damages to Rich in spite of the breach by Rich found by the court or whether Cass's abandonment was justified by the Breach of Rich--issues to which the parties devoted substantial portions of their briefs.
 
 IV. Damages
 
 33
 Appellants argue that seven errors were made by the district court in computing damages. Rich also argues errors were made in allowing a setoff by Cass. Since computation of damages is a factual issue, we must affirm the findings of the district court unless we find them[4] 'clearly erroneous.' Fed.R.Civ.P. 52. The arguments of the parties will be considered seriatim.
 
 A. Errors Urged by Appellants
 
 34
 1. No evidence on which to base delay by Cass. This argument has two aspects. The first is whether there was evidence to support the equal division of the 292 days delay between Rich and Cass. Since we have found as a matter of law that Rich could not be held responsible for one-half of the delay, we need not further consider this point; the entire delay in constructing the building pads must be charged to Cass.
 
 
 35
 In the second prong of this argument, appellants challenge whether the evidence is sufficient to show that the 292 days delay in completion of the building pads delayed the project by the same amount. Appellants note that eight of the building pads they completed were not used by Rich for several months. They further argue that Cass was not the 'lead man' throughout the project.
 
 
 36
 The record contains evidence that the pads were scheduled to be completed in an orderly designated, geographic sequence and in a smooth fashion over the period during which they were scheduled for construction. The pads were delivered in a haphazard order and to some extent in groups of several at one time. For these reasons we cannot hold that Rich's failure to use eight of the pads completed is so inconsistent with the findings of the district court that we must hold them clearly erroneous.
 
 
 37
 Similarly we cannot find that deviations from the planned order of work took Cass out of the critical path. First, appellants misconstrue the sense in which a contractor must be 'lead man' for it to be on the critical path. It need not be the first contractor on the job but only need be the contractor whose work must be completed before the next contract holder can go to work. Thus, it is of no significance that a surveyor needed to complete his work before Cass could proceed unless Cass was delayed because the surveyor had not completed his work. Suffice it to say the district court did not so find. Appellants also argue that the order of construction was changed so that foundations were poured before Cass compacted the pads. This change did not prevent construction from being delayed by Cass's delinquency because a building slab could not be poured and erection started until after a pad passed compaction. We cannot fault the district court for treating the deviations cited by appellants as insignificant.
 
 
 38
 2. Computation of General and Administrative Expense. The district court charged Cass with the increase in general and administrative expense incurred by Rich as a result of the delay. That delay has an impact on general and administrative expense is beyond dispute, but the extent of that impact is difficult to estimate. To compute increased general and administrative expense, the district court determined general and administrative expense as a percentage of sales for 1969 and 1970, took the lower of the two figures, multiplied this by the original contract price, and then divided by the original contract period to determine the general administrative expense allocable to the contract on a per day basis. This figure was then multiplied by the 146 day delay found by the district court to arrive at damages chargeable to Cass. Appellants do not challenge the percentage of sales figures used or the technique used for making the allocation. They do challenge the use of the original contract price rather than the adjusted contract price.
 
 
 39
 We find no justification for the use of the original contract price. The district court found that in early 1969 the government eliminated items from the contract which reduced the price from $3,846,000.00 to $3,360,000.00. Rich's arguments and the testimony in the court below supporting the use of the higher figures are almost totally conclusionary. The district court's figures appear to be taken directly from an exhibit prepared by Rich. We can see no reason Rich should pass on overhead costs at the per diem rate originally bid rather than that ultimately agreed upon. As counsel for Cass stated: 'A percentage reflecting general and administrative expense must be based on sales that one has and not upon sales that one thought that one might get.'
 
 
 40
 In accord with these findings, we have recomputed the damages allowed for general and administrative expenses. The details of both the district court's and our calculations are set forth in Schedule B attached to this opinion.
 
 
 41
 3. Liquidated Damages Assessed by the Government. The trial court charged to Cass the entire 76 days liquidated damages assessed against Rich by the Government. Cass argues that there is no logical reason for not splitting these damages between Rich and Cass in the same manner that the other damages for delay were divided. Since we have determined that none of the delay damages should be divided, we need not further consider this point.
 
 
 42
 4. House services for water distribution eliminated. Appellants argue that it was error for the trial judge to talk Cass's attorney out of objecting to the admission into evidence of a change order, which Cass had not signed, dated February 12, 1971 (after the complaint in this suit was filed). Cass was originally to install the house services, but this requirement was eliminated from Cass's contract when the government changed the specifications to plastic pipes. Cass's president testified that the parties agreed to reduce the contract price by $13,667.21. A witness for Rich testified that the proper deletion was the amount shown on the change order to which Cass objects, $22,754.00. The amount on the change order purported to be taken from a payment breakdown of May 18, 1969, prepared by Cass. Though we do not hold that it was error for the district court to admit the change order as evidence, we hold it was error for it to use $22,754.00 in computing the adjusted subcontract price.
 
 
 43
 Rich was obliged to make periodic payments to Cass as construction progressed. To receive such payments, Cass completed an application for partial payment on a form provided by Rich. The cover sheet of the form contained columns for Cass to show 1) the breakdown amount for major categories of work, 2) the percentage completed, and 3) the total amount completed for which payment was being requested (after 10% retainage and prior payments were deducted). The same page also contained columns 'For F.D. Rich Company Use Only' in which Rich would indicate the percentage and amount completed. In these columns Rich would adjust amounts requested based on the work that had been approved by the Government. The internal pages of the form contained the detail upon which the composite figures on the cover were based.
 
 
 44
 House services were included on the forms in the major category, 'Water Mains.' Under the subcategory 'House Services,' the breakdown amount for 'Valves, Stops & Services' was $22,754.00, the amount shown on the change order issued by Rich and the amount used by the district court. The columns for work completed show $7,614.80. Similarly Rich's bar graph of the Cass contract (Trial Exhibit IK) shows that Cass performed work in this category before the house services were deleted. On the cover page Rich included this amount of work as work completed in the 'For F.D. Rich' columns, and it clearly should not have been adjusted out of the amount deleted. In later applications for partial payment, the cover page shows a deduction from the Water Main category of $13,667.21 for the contract modifications. This is the agreed adjustment according to the testimony of Cass's president. He testified that the additional $1,471.99 resulted from a later agreement.[5]
 
 
 45
 Rich's approval of Water Main Work completed indicates the work was 98% complete. Rich multiplies this by the adjusted price shown by Cass to arrive at the amount approved. Since $13,667.21 was used by both parties as the correct adjust amount, without objection until after this litigation began, and having read the testimony of both Cass's president and Rich's witness concerning this figure,[6] we hold it was error for the district court to use the higher figure. The effect of this adjustment on damages is set forth in Schedule C attached to this opinion.
 
 
 46
 5. Responsibility for Delay. The district court used a total contract period of 850 days in computing additional General Operating Field Expenses. The source of this figure is unclear. In making several calculations, the district court attributed 146 days of this delay to Cass, one half of the 292 days by which Cass was late in delivering the building pads. USF&G argues that the actual contract period was 884 days and that only 38 days should be attributed to Cass. USF&G's calculations are as follows:
 
 
 47
 Original Contract period 540 days
Contract extensions for
 which the government
 did not charge a penalty 268
Days for which penalty
 charged 76
 ---
Total contract period per
 USF & G 884 days
 ---
 
 
 48
 USF&G argues that since the Government 'accepted responsibility' for delaying the project 268 days, the days cannot be charged against Cass, only the remaining 76 days can be. Further, USF&G contends that since the district court held damages should be divided between Cass and Rich, only 38 days (1/2 of 76) should be charged against Cass. Since we earlier held that damages should not be divided between Rich and Cass, we may ignore this final contention. Rich argues that the district court found that the reasons the Government granted extensions had no relation to Cass's delay and therefore need not be considered. The facts cited by USF&G are not sufficient for us to enter judgment on this basis, but neither is the finding by the district court that the extensions granted by the Government were unrelated to Cass's delay sufficient for us to affirm.
 
 
 49
 The questions are whether the delay for which the Government did not charge Rich with a penalty (hereinafter referred to as 'Government delay') was an actual delay or only an apparent one and, if an actual delay, whether it was in addition to the delay caused by Cass or whether it was concurrent with that caused by Cass. In other words, looking at the figures in gross, if the project was delayed 292 days by Cass and then 268 days by the Government, for a total of 560 days, Cass would be responsible for the full 292 days. Similarly, if the 268 days did not result in actual delay to the project, because the delayed items were not on the critical path of the project and the project would not have been delayed by these days had Cass been on schedule, then Cass is fully responsible for the 292 days. On the other hand, if the project would have been delayed 268 days even if Cass had completed its work on schedule, then Cass and the Government were each sufficient causes for the 268 days of delay.[7] On remand the district court will have to determine which of these situations, or some hybrid combination thereof, existed in this case. Some of the Government delay may fall into one category; some into another. Total figures were used here only to provide an example.
 
 
 50
 We express no opinion on the extent to which Cass would be liable if the delays were concurrent, the final hypothetical posited above. We can conceive of equitable and policy arguments ranging from holding Cass completely responsible for the concurrent portions of the delay to holding Cass liable for none of the concurrent portion. This issue, which may or may not even need to be reached depending on factual determinations by the district court, has neither been briefed nor argued before the court.
 
 
 51
 The schedules attached to this opinion do not reflect any adjustment for the problems noted in this subsection and therefore may need to be modified by the district court to reflect these considerations before judgment can be entered. On remand, findings of fact and conclusions of law should be entered on the matters discussed in this subsection, and we suggest their effect, if any, be summarized as modifications on a schedule which follows generally the format of Schedule A.
 
 
 52
 6. Overpayments by Rich. USF&G argues that it, as surety for Cass, should not be required to pay $77,557.53[8] of the damages awarded to Rich because a witness for Rich testified that Cass had been overpaid by that amount. According to USF&G, Indiana law provides that overpayment by a principal releases a surety to the extent of the overpayment. Detroit Fidelity & Surety Co. v. Bushong, 96 Ind.App. 352, 175 N.E. 683 (1931) (en banc).
 
 
 53
 Indiana law does not mandate the result urged by USF&G. The key element to the Bushong case is that the payments were made in excess of the amount due under the terms of the contract on which the surety bond was issued. Both the surety bond and the payment bond between Cass and USF&G for the benefit of Rich contain the following language:
 
 
 54
 'The Surety (USF&G) and the principal (Cass) hereby jointly and severally agree with the Obligee (Rich) that the obligation of said Surety and its bond shall be in no way impaired or affected . . . by any payment (under the subcontract) before the time required therein . . . and such Surety does hereby waiver notice of any and all such . . . payments . . ..'
 
 
 55
 The subcontract, incorporated into the surety bonds by reference, contained similar language in specifying the payment obligation of Rich: 'First party (Rich) at its sole option, may make prepayments without affecting the terms hereof nor the liability on any bond given by the second party (Cass).' Article XXI, $2.
 
 
 56
 Although Rich's witness characterized the payments made to Cass as 'overpayments,' they are not overpayments in the sense that they were funds which would not have been due Cass had Cass remained on the job but rather overpayments in the sense that the funds were not yet due Cass; i.e., they were prepayments. They were therefore not payments in violation of the contract which would release USF&G. We have no reason for thinking that if Cass had remained on the job it would not ultimately have repaired its deficient work.
 
 
 57
 . Limitation of Damages. USF&G's claim that the damages awarded against appellants should be limited to $280.00 per day, the amount which the Government could collect against Rich as liquidated damages, is totally frivolous. USF&G argues that any greater amount would be beyond the contemplation of the parties. The liquidated damages which the Government may have been willing to accept by virtue of being delayed in utilizing the facilities have no relationship to the damages which Rich suffered as a result of excess time on the project. The subcontract contemplated this problem:
 
 
 58
 'The second party (Cass) agrees that if it shall delay the progress of the work, so as to cause any damage, for which the first party (Rich) shall suffer or become liable, it shall make good to the first party any such damages, all inclusive, and the assent or permission of the first party to the delayed finishing of the work shall not be construed as a waiver of the agreement to make good any damage caused by such delay or default or a forfeiture of such damages.' Article VII, $2.
 
 
 59
 Thus, the liquidated damage provision of the general contract in no way limits the damages for which Cass may be charged even though it is a component of those damages.
 
 B. Errors urged by Rich
 
 60
 Rich argues that Cass should not be allowed to set off the amount allowed for the work Rich required Cass to perform in establishing temporary access roads. Under Rich's theory Cass was to grade and compact the soil on which the permanent roads through the project would be built. On this compacted soil Cass would lay a four inch sub-base for the road. This would be used during construction for temporary access and would enable the drainage system to operate. This apparently was the sequence contemplated by the engineers who designed the project. Cass argues the sub-base would be inadequate to carry heavy construction traffic and that therefore Rich should have rocked the roadway for temporary access after the soil was compacted and then, when all work in an area requiring heavy equipment was completed, this rock would be removed and construction of the final road could proceed.
 
 
 61
 Rich correctly argues that it had no responsibility to Cass to provide temporary access on the project, but this does not mean that Cass had the responsibility of providing the system of internal access roads. The district court found that Rich's plan of using the sub-base would not have worked. The testimony before the district court conflicted on this point, and we cannot say that it was clearly erroneous in its holding. When Rich instructed Cass to put down gravel, it was ordering work which was not within the subcontract and therefore for which additional payment was required.
 
 
 62
 The allowance for repairing damages to the subgrade caused by Rich and subcontractors is a closer question, first, because the subcontract contemplates some repairs by Cass and, second, because the subcontract provides that Rich would not be liable for damages of other subcontractors. Once again, however, we cannot hold the district court clearly erroneous in light of ambiguity regarding who caused the damages and in light of testimony that Rich refused to prevent other subcontractors from using the unrocked subgrade.
 
 V. Conclusion
 
 63
 The decision of the district court is reversed and remanded for proceedings not inconsistent with this opinion. Judgment shall be entered against Cass and against USF&G to the extent it is liable within the limits of its bonds.
 
 
 64
 Notwithstanding occasional moments of apparent impatience with highly contentious counsel for each of the parties, Judge Holder did an excellent job in trying a complex case and drafted a thorough memorandum regarding its disposition. No purpose would be served by requiring a new judge to familiarize himself with the complex facts involved in this case. Circuit Rule 23 shall not apply.
 
 
 65
 Each party shall bear its own costs on appeal.
 
 
 66
 Reversed and remanded.
 
 
 67
 APPENDIX
 SCHEDULE A
 DAMAGES AWARDED
 District Court Revised a
 Award
 DAMAGES TO RICH as Amended Award
------------------------------------------ -----------------------------------
Higher Cost of Labor $20,698.00 $41,396.00
76 days liquidated damage charged by
 government 21,280.00 21,280.00
Labor hours lost 29,778.47 59,556.94
Demurrage charges 3,881.88 7,763.76
General operating field expenses 63,284.16 126,568.32
General administrative expenses -- 60,934.56 106,469.04
 Schedule B
 ----------------- ----------------
 Total damages for delay 199,857.07 363,034.06
 ----------------- ----------------
Direct costs incurred by Rich on behalf of
 Cass in excess of contract amount --
 Schedule C 112,423.61 103,336.82
Credit to Government for deficiencies 3,900.00 3,900.00
Payments made to subcontractor to complete
 subcontract work 20,339.49 20,339.49
 ----------------- ----------------
 Total damages for abandonment 136,663.10 127,576.31
 ----------------- ----------------
Total damages to Rich 336,520.17 490,610.37
 ----------------- ----------------
DAMAGES TO CASS
------------------------------------------
Stone for road base, lost or contaminated 21,786.26 21,786.26
Labor and equipment used to spread stone 3,518.01 3,518.01
Re-do work resulting from damages by
 contractor or subcontractor: labor 10,924.20 10,924.20
 equipment 27,310.50 27,310.50
 ----------------- ----------------
 Total contract damages 63,538.97 63,538.97
 ----------------- ----------------
Additional stone ordered 645.65 645.65
Additional machinery ordered 1,360.63 1,360.63
Payments to Cass b (1,420.06) (1,420.06)
 ----------------- ----------------
 Total additional award 586.22 586.22
 ----------------- ----------------
Total damages to Cass 64,125.19 64,125.19
 ----------------- ----------------
NET AWARD TO RICH 272,394.98 426,485.18
PREJUDGMENT INTEREST 14,626.50 22,900.54
 ----------------- ----------------
NET DAMAGES AWARDED TO RICH
 INCLUDING INTEREST $287,021.48 $449,385.72
 ----------------- ----------------
__________
 
 
 68
 a. This column summarizes the modification to the award of the district court which this court has made; it does not show the revisions which may be made necessary by the findings of the district court made pursuant to Part IV.A.5 of this opinion.
 
 
 69
 b. These payments were not originally credited to Rich but were added by way of an amendment to the judgment.
 
 
 70
 SCHEDULE B
 GENERAL AND ADMINISTRATIVE EXPENSE
 District Revised
 Court
 -------------- --------------
Grissom Air Force Base
 contract price $3,846,000.00 $3,360,000.00
General and administrative expenses
 as a percentage of sales
 (undisputed) 5.86% 5.86%
 -------------- --------------
Allocated general and
 administrative expenses $ 225,375.60 $ 196,896.00
 -------------- --------------
Per diem general and administrative
 expenses based on original contract
 period of 540 days $ 417.36 $ 364.62
 -------------- --------------
Increased general and administrative
 expenses allowed Rich as damages
 (district court damages based on 146
 days; revised damages based on
 292 days) -- Schedule A $ 60,934.56 $ 106,469.04
 -------------- --------------
 SCHEDULE C
 DIRECT COSTS INCURRED BY RICH IN
 EXCESS OF CONTRACT AMOUNT
 District Revised
 Court
 -------------- --------------
Total direct costs incurred on behalf
 of Cass as found by district court $480,278.54 $480,278.54
 -------------- --------------
Original subcontract price 390,000.00 390,000.00
Change Order No. 1 --
 elimination of house
 services for water (22,754.00) (13,667.21)
Change Order Nos. 2 through 5
 (undisputed) 608.93 608.93
 -------------- --------------
Adjusted contract price 367,854.93 376,941.72
 -------------- --------------
Direct costs in excess of contract
 amount -- Schedule A $112,423.61 $103,336.82
 -------------- --------------
 
 
 
 *
 Senior District Judge Joseph Sam Perry of the Northern District of Illinois is sitting by designation
 
 
 [1]
 Cass, H & S, and USF&G are herein collectively referred to as 'appellants.'
 
 
 [2]
 An 1881 Indiana statute, Indiana Code 34--1--47--1, provides:
 '(a) . . . The party obtaining a judgment shall not take an appeal after receiving any money paid or collected thereon.' In 1969 the Indiana Rules of Civil Procedure were enacted and repealed various specific statutes, which did not include 34--1--47--1, and also repealed 'all laws and parts of laws in conflict' with the 1969 act. Ind.Code 34--5--1--3. Rule 72 of the 1969 act provided:
 '(d) . . . subject to an agreement to the contrary, any appeal, and any relief sought to reverse or avoid a judgment or order as permitted by these rules shall not be denied to a party.
 (1) with a judgment or order in his favor because he has enforced, received or accepted payment thereunder . . ..'
 Reprinted in compiler's notes following Ind.App. Rule 4 in Burns Ind.Stat.Annot.
 This Rule would appear to contradict the portion of 34--1--47--1 quoted above, but the history does not stop there. Under date of January 1, 1970, the Indiana Supreme Court, pursuant to authority granted by the legislature in the 1969 act, issued comprehensive rules of procedure. The 1969 rules were not repealed but were superceded to the extent they conflicted with the new rules. Rule 72(d) of the 1969 act was not carried forward with the 1970 rules but does not directly conflict with them either. On September 1, 1970, the Indiana Appellate Court, en banc, applied the 1881 statute to dismiss an appeal from a decision of the Indiana Public Service Commission. Board of Trustees v. Public Service Commission, 147 Ind.App. 404, 261 N.E.2d 373 (1970). The appellate court made no mention of Rule 72(d). In 1971 the 1881 act was recodified by the legislature with the Indiana Code, but also in 1971 the Indiana Supreme Court applied a different subsection of Rule 72 holding that the 1969 act was still in force except when it conflicted with the rules issued by the court. Richards v. Crown Point Community School Twp., 256 Ind. 347, 269 N.E.2d 5 (1971). Later in 1971 this court, as noted in the text, accepted the stipulation by counsel in Moser.
 Both parties argue that this history supports their interpretation of Indiana law. We prefer to allow the Indiana courts to resolve this confusion when the appropriate case is presented in the state courts.
 
 
 [3]
 Cass's contention that there was an accord and satisfaction resulting from the agreement raises some interesting legal questions. If there was an accord and satisfaction, would Cass as a signatory be also not bound on this appeal to a recognition of the correctness of the judgment? This possibility Cass apparently attempts to circumvent by denying authority to the lawyer signing for it. If one of the signatories was not bound on a bilateral contract executed without authority, would the remaining signers remain bound?
 
 
 [4]
 We come away from an examination of the complex and conflicting evidence in this case with the impression of the real unlikelihood, if both parties were responsible for a total number of days delay, that their fault in that respect would be exactly equal. This might well have been an equitable basis for the parties to have compromised their claims against each other. The parties, however, did not compromise and settle and thereby left the district court the uncomfortably difficult job of attempting to evaluate the contributions to delay, and their chargeabilities, on an actual rather than an equitable basis
 
 
 [5]
 
 Initial amount for Valves, Stops &
 Services $22,754.00
Less: Work completed and application
 for partial payment. (7,613.80)
 Later agreed adjustment per
 Cass President. (1,471.99)
 ------------
Adjustment to contract as shown
 on later applications for
 partial payment $13,667.21
 ------------
 
 
 [6]
 This testimony, as well as most of the numeric testimony, was extremely difficult to follow because counsel failed to include as part of the record on appeal many of the exhibits to which the testimony applied and on which the testimony was based. We do not mean to indicate that all exhibits in a trial as lengthy as this should be included, but when testimony is in issue which is unclear without exhibits, they should be included. Short excerpts out of context included in appendices were here of only minimal assistance
 
 
 [7]
 An analogy, which comes to mind from the law of torts, is the case of two forest fires set by different persons which destroy a house in their path when either of the fires would have destroyed the house had the other fire not been set
 
 
 [8]
 Even if we agreed with USF&G on the law, we could not accept this as the amount of overpayment without further analysis. The witness on whose testimony USF&G relies stated that Rich had paid $247,390.09 on behalf of Cass and that $74,747.65 was expended for deficiencies after Cass left the job. Clearly use of $74,747.65 is incorrect because the district court only allowed $67,765.50 for deficiencies after Cass left the job, specifically disallowing the difference of $6,982.15 as a charge prayed for by Rich which was not within the Cass subcontract. Also, there appears to be a discrepancy between that amount paid on behalf of Cass as found by the district court and the amount testified to by the witness on which USF&G relies. It is unclear whether the differences between USF&G's and the district court's figures could be reconciled if the exhibits to which the witnesses testifying to the various amounts referred had been included in the record on appeal