Revised July 14, 1999

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 97-60675

PYCA INDUSTRIES, INC., ET AL.,

Plaintiffs,

PYCA INDUSTRIES, INC.,

Plaintiff-Appellant,

versus

HARRISON COUNTY WASTE WATER
MANAGEMENT DISTRICT; ET AL.,

Defendants,

MAX FOOTE CONSTRUCTION COMPANY, INC.,

Defendant-Cross Claimant-Appellee-Appellant,

versus

OWEN AND WHITE, INC.,

Defendant-Cross Defendant-Cross Claimant-Appellee,

versus

HARRISON COUNTY WASTE WATER
MANAGEMENT DISTRICT,

Defendant-Cross Defendant-Appellee-Appellant.

Appeals from the United States District Court
for the Southern District of Mississippi

May 27, 1999

Before GARWOOD, BARKSDALE and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Before the court is a reprise of the travails of the construction of Harrison County, Mississippi's wastewater treatment facility. We have examined many issues in this case in an earlier opinion, see PYCA Indus., Inc. v. Harrison County Waste Water Management Dist., 81 F.3d 1412 (5th Cir. 1996) ("PYCA I"), and here are asked to resolve additional disputes between the county and its contractors. Currently before us is the appeal from a grant of summary judgment in favor of Harrison County Waste Water Management District ("District") on the issue of the District's role in adjusting the cost of and the time for performance under a contract it had with Max Foote Construction Company ("Foote"). Execution of the contract required Foote to subcontract with numerous other companies, and one such subcontract, with PYCA Industries, Inc. ("PYCA"), led to the instant dispute.

The history of this case resides in multiple contract and tort claims among several different parties arising out of the construction of the $9.27 million West Biloxi Wastewater Treatment Facility ("Facility"). After several years of litigation and a previous appeal, the status of the case today is that Foote and PYCA claim that the District violated its contract with Foote, and PYCA claims intentional interference by Defendant-Appellee Owen & White, Inc. ("O&W") with PYCA's contractual relationships. The district court granted sovereign immunity to O&W as an agent of the District, which this court previously held had sovereign immunity as well, see PYCA I, 81 F.3d 1412, 1419-20 (5th Cir. 1996). The district court also found that the contract claims raised by PYCA and Foote had not been properly preserved or were otherwise barred. PYCA and Foote (collectively, "Appellants") now argue that their rights were preserved in accordance with the contract documents and that summary judgment was otherwise improvidently granted because material issues of fact exist about the propriety of certain price adjustments under the contract. The parties also submit that they should

2

have been granted summary judgment on the issue whether the District violated its contract with them. PYCA also disputes the extension of sovereign immunity to O&W and requests additional equitable relief.

We begin the opinion with an overview of the factual and procedural background to this case and a statement regarding the standard of review that we will apply. In Part III, we address Foote's claims on appeal; Part IV concerns the District's cross-claim against Foote. Part V of the opinion resolves PYCA's claims against the District, while Part VI addresses the joint claim of Foote and PYCA. Finally, in Part VII, we dispose of PYCA's claim against O&W. For the reasons articulated below, we affirm the judgment of the district court.

## I

The instant case involves the remaining claims between the parties in this litigation arising out of the construction of the Facility.[1]

## A

The District hired Foote on September 27, 1989,[2] pursuant to Contract No. 88-1, as the general contractor for the project.[3] The contract designated O&W as the project engineer and the

---

[1] A fuller version of the underlying facts in this case is set out in PYCA I, 81 F.3d at 1414-16. It is worth reiterating that the District was created by the Mississippi state legislature for the purpose of (1) abating the serious pollution of the Mississippi Sound, its tributaries, and other waters in Harrison County through regulations dealing with the discharge of wastewater; and (2) owning, operating, and maintaining all wastewater treatment plants in Harrison County. It was pursuant to that second duty that the District undertook to renovate the Facility.

[2] The contract was actually executed on October 16, 1989.

[3] The contract included provisions that granted the District the right to direct changes in the contract and provided that any such changes would result in an equitable adjustment to the amount due Foote. In the event an agreement concerning the amount of such an adjustment could not be reached by the parties, the contract provided, in a "Remedies" section, that Foote could pursue a

3

authorized representative of the District. PYCA, an electrical subcontractor, provided a bid to Foote for the underground wiring and conduit work and the supply and installation of the electrical equipment at the Facility, and that bid was incorporated by Foote into its own bid to the District. Foote ultimately secured the general contract. Subsequently, Foote hired PYCA (pursuant to Subcontract No. 80-16000) for $1.916 million on December 5, 1989 to perform the electrical work on the project.[4] PYCA was bound to Foote under the terms of its subcontract by all the terms and conditions of the prime contract. After its bid was accepted, in February 1990, PYCA entered into a purchase order contract with The Reynolds Company ("Reynolds") for the purchase of all electrical equipment for the project.[5] While the project was ongoing (in July 1990), the District and O&W negotiated with Foote and PYCA for certain changes in the electrical distribution system, changes which PYCA and Foote had proposed before the commencement of the project.[6] The prime contract required that a change order be issued to effectuate such changes. Because the District had obtained federal funding for the project, Foote's contract and PYCA's subcontract were subject to certain EPA

claim against the District.

[4] PYCA had extensive experience both as an electrical prime contractor and subcontractor. In the eleven years prior to its agreement to perform the electrical work on the Facility, PYCA had performed 246 contracts on primarily public works projects.

[5] This purchase order contract was in the amount of $450,000; all of the electrical equipment at issue was manufactured by Siemens Energy & Automation, Inc. ("Siemens").

[6] Prior to executing its subcontract with Foote or entering into the agreement with Reynolds, PYCA and Foote in October 1989 made a valued engineering proposal to O&W and the District in which they proposed design changes in the electrical distribution system which would net the District savings in excess of $300,000. This proposal, formally submitted on November 21, 1989, utilized prices from lower-priced suppliers than Reynolds; the proposal was rejected at first but later accepted (in April 1990).

4

regulations, which, among other things, provided an orderly process for changes in the work. O&W, under the District's direction, was responsible for reviewing and approving these change orders.

The District ultimately directed O&W to implement the changes suggested by PYCA and Foote. Although the parties reached an agreement on a credit for the underground electrical wiring and conduit work, they could not agree on a credit for the revised equipment necessary for the project. Nevertheless, the District made equitable adjustments to the amount due to Foote based on its own calculations. The net effect of the adjustment was that the District paid less than originally planned to Foote, which resulted in less money paid by Foote to PYCA. Foote (and PYCA through Foote) objected to the change order because they disputed whether proper equitable adjustments were made based on the changes to the electrical system. Because PYCA had, in the interim, contracted with Reynolds, PYCA believed that the equitable adjustment should reflect the prices being charged by Reynolds, not the proposed prices made before PYCA's subcontract was executed. Nevertheless, the District initially determined that the proper equitable adjustment was $161,180. The District reached that figure by obtaining price quotes from additional electrical equipment suppliers, a step which PYCA contends was a breach of the prime contract.

The prime contract did require Foote and PYCA to apprise the District and O&W of the costs associated with the purchase of the electrical equipment, and, in March 1991, the District sought that data.[7] At the same time, Reynolds refused to allow the District, seeking similar information, to audit its records.[8] O&W determined that the pricing by PYCA's suppliers was not substantiated and

_____

[7] The prime contract provided that PYCA and Foote were limited in the amount of profit and overhead markup that they could charge under the contract.

[8] By contrast to Foote and PYCA, a supplier such as Reynolds was not limited by the prime contract in the amount of profit it could make. Nevertheless, the District and O&W apparently did

decided that a further adjustment was required; the District and O&W sought to force PYCA to seek other equipment options based on the price quotations they had obtained from other suppliers. Consequently, and with the approval of the Mississippi Department of Environmental Quality, O&W issued change order #7 on July 2, 1991, as an "agreed change order" establishing a change in the total credit due to the District from $161,180 to $283,109. Foote refused to agree to the change order, so, on August 7, 1991, the District issued it as a "unilateral change order" as allowed under the prime contract. The change order reduced Foote's payment by $283,109, and Foote in turn reduced its payment to PYCA by an identical amount. PYCA objected on the ground that this increase in the amount deducted forced it to breach its purchase price commitment with Reynolds. Foote objected to the District's unilateral determination in an attempt to preserve PYCA's rights. Although PYCA initially refused to complete its subcontract with Foote until the credit dispute was resolved, PYCA, responding to the threat of contract termination exerted by the District, ultimately finished its portion of the project.[9]

There is no dispute that the changes to the electrical distribution system resulted in a cost savings which the District was entitled to realize. The District contends that the maximum amount of credit due it is $283,109, while PYCA argues that the reasonable credit is $122,000. Although any adjustment in the amount of credit claimed by the District will pass through Foote directly to PYCA, Foote asserted that the contract completion was delayed 59 calendar days by the District's

---

not care for the markups made by Reynolds; the District's and O&W's actions in "correcting" what they perceived to be unfair markups ultimately led to the instant dispute.

[9] During the pendency of the dispute, PYCA, through Foote, notified the District and O&W in writing of claims against them stemming from the performance of certain work and the supply of certain materials that PYCA asserted was not required by the contract.

failure to resolve the dispute regarding the changes to the electrical distribution system and the pricing of these same changes in a timely fashion.[10]

**B**

On August 28, 1991, PYCA sued the District, O&W, Foote, and Fidelity & Deposit Company of Maryland ("F&D") as surety under the labor and materials bond.[11]  In count one, PYCA sought a declaratory judgment on the issue whether the District, O&W, or Foote were authorized under the prime contract to examine Reynolds's price data, bid-shop the price of the electrical equipment, or cause PYCA to breach its agreement with Reynolds by taking unilateral action.  In count two, PYCA alleged that actions by the District, O&W, and Foote breached the contract and violated 40 C.F.R. § 33.1030 by failing to provide PYCA an equitable adjustment pursuant to change order #7, resulting in damages of $161,000.  In count three, PYCA alleged that the District, O&W, and Foote breached the contract by requiring PYCA to perform extra work on the influent pump station, installing electrical meters, and installing a generator radiator without an equitable adjustment by way of a change order.  In count four, PYCA sought damages against the District, O&W, and Foote in connection with the delay caused by change order #7.  In count five, PYCA alleged that the actions of the District and O&W constituted intentional interference in PYCA's contractual relationship with Foote and Reynolds, causing PYCA to breach its contract with Reynolds and default on its

---

[10] On July 31, 1992, Foote submitted a claim for a 59-day extension in the contract time and damages in the amount of $181,365.  PYCA also asserted a claim through Foote in the amount of $44,705 for delays caused by the District's failure to resolve the issues associated with the changes to the electrical distribution system.

[11] On September 24, 1991, the District filed a motion to dismiss prior to answering the claims.

subcontract with Foote.[12] This particular count seeks damages of at least $161,000. In count six, PYCA alleged, *inter alia*, that Foote and its payment bond surety breached the subcontract by failing to pay all retainage and other amounts due thereunder.[13] In count seven, PYCA sought punitive damages from all defendants. This court affirmed the district court's dismissal of the punitive damages claim against the District, and PYCA settled its claims against Foote and F&D. Only the punitive damage claims against O&W are in dispute on this appeal.

Foote answered and filed a cross-claim against the District alleging that if it is liable to PYCA, then the District is liable to Foote. Foote also asserted its own claim of $181,323 for delays and disruptions associated with the District's issuance of change order #7 and remission of liquidated damages. The District filed a separate answer to Foote's cross-claim, asserting two affirmative

---

[12] This court previously determined that the District is a political subdivision of the state and thus entitled to sovereign immunity. See PYCA I, 81 F.3d at 1420. In order to avoid confusion associated with "political subdivision," a term of art used in our jurisprudence under the 11th Amendment to the United States Constitution to *preclude* a finding of immunity, we observe here that our finding of sovereign immunity for the District was based on a construction of the Mississippi Sovereign Immunity Act of 1984, MISS. CODE ANN. § 11-46-1-23 (Supp. 1995). See id. at 1418. We employed state law rather than 11th Amendment law because, in this diversity action, Mississippi state substantive law applies to the tort claims in this suit. See id. at 1417 n.4. Under Mississippi law in place at the commencement of the instant controversy, the State and its political subdivisions were entitled to sovereign immunity, while municipalities within the State were subject to a governmental/proprietary function distinction. See id. at 1418-19. We acknowledge that characterizing the District as a "political subdivision" would prevent an extension of sovereign immunity to it under the 11th Amendment.

We rule *infra*, Section VII, on the question whether PYCA's tort claims against O&W are also precluded by sovereign immunity under Mississippi statute.

[13] The disputes in count six were settled between PYCA, Foote, and F&D and are no longer part of this case.

defenses: (1) the cross-claim "fails to state a cause of action;" and (2) the district court lacked jurisdiction.[14]

In the first of two Memorandum Opinions entered on January 18, 1994, the district court granted a motion to dismiss counts one, two, three, and four, filed by the District and joined by O&W. The court held, *inter alia*, that there was no privity of contract between PYCA and the District or between PYCA and O&W. We subsequently dismissed count five (interference of contract) against the District on grounds of sovereign immunity. See PYCA I, 81 F.3d at 1419-20. In May 1997, the district court issued an order similarly dismissing counts five and seven against O&W, holding that O&W shared in the District's sovereign immunity.[15] PYCA later settled its

[14] Although not of central relevance to this appeal, the following events occurred during the course of this litigation which impact a complete understanding of this dispute: On March 17, 1993, Foote sought to amend its pleadings to include claims against Universal Blower Pac, Inc. ("Universal"). The magistrate judge denied the motion to amend. On January 12, 1994, the district court ordered that Reynolds be joined as a party, and PYCA subsequently filed an amended complaint, on January 27, 1994, joining Reynolds as an involuntary plaintiff. On February 11, 1994, the District filed its answer, and, on February 23, 1994, Foote filed its answer to the amended complaint and amended its cross-claim against the District asserting the contract balance due Foote under the contract. The District had refused to pay Foote its contract balance, contending that certain equipment furnished by Universal was defective. The District subsequently filed a motion to strike a portion of Foote's answer which it alleged pertained to Universal only. Foote claims that the contested portion did not pertain to Universal but merely sought to clarify Foote's cross-claims against the District. Nonetheless, on May 5, 1994, the district court granted the District's motion to strike portions of Foote's amended cross-claim alleging that the District breached its contract by not making equitable adjustments with regard to Foote.

On June 14, 1994, the District filed its motion to amend to include additional cross-claims against O&W and Foote and counterclaims against PYCA. On June 28, 1994, the district court, through the magistrate, denied the District's request, stating that the "motion is untimely and will delay final resolution of the trial." The District objected on July 11, but the court overruled the objection on October 3, 1994.

[15] O&W observes that the district court entered an order on November 8, 1994, finding as a matter of law that O&W was at all times the agent for the District and thus not liable for claims of punitive damages. This particular claim was dismissed as to Foote and O&W for lack of appellate jurisdiction in PYCA I because it had not been certified for interlocutory appeal. See 81 F.3d at

9

retainage claim against Foote and has dropped all claims against F&D. In the second January 18, 1994 Memorandum Opinion, the district court addressed, *inter alia*, PYCA's claims against Foote. The court granted partial summary judgment in favor of Foote, finding that Foote did not breach its subcontract with PYCA by merely passing down to PYCA the deduction of $283,109, in accordance with change order #7. The district court also requested additional briefing on the sovereign immunity question before issuing an opinion thereto, but it did allow PYCA to file two amended complaints.

On October 3, 1994, the district court ruled that the District was not entitled to sovereign immunity and stayed the proceedings pending appeal. We reversed that determination in PYCA I.

Following our May 3, 1996 opinion, which disposed of various issues previously certified by the district court for interlocutory appeal, the case was reactivated. On March 3, 1997, the case was set for a jury trial on April 7, 1997. The parties attended a pretrial conference on March 25, 1997. After meeting with the parties in chambers, the district court determined that trial on the merits was premature in light of various dispositive issues raised by the parties. On April 9, 1997, the district court denied PYCA's motion to strike the District's jury demand. On April 28, 1997, the district court directed the parties to file dispositive motions and supporting briefs on the remaining issues.

This directive instructed the parties to submit briefs addressing whether PYCA's claims against the District properly "flowed through" Foote.[16] The parties were further directed to address the following issues: (1) whether Foote effectively preserved PYCA's flow-through rights against the District in accordance with the procedures set forth in the prime contract; (2) whether PYCA has standing to challenge the District's unilateral actions with regard to change order #7; (3) what rights,

1421-22. Since a final judgment has now been entered, we will address this issue *infra*, Section VII.

[16] We explain the concept of "flow through" rights at length *infra*, Section V.

10

if any, PYCA has to challenge equitable adjustments made by the District; and (4) whether the District is entitled to dismissal/summary judgment on Foote's cross-claim.

Foote and PYCA ultimately filed a joint motion for summary judgment. On August 29, 1997, the district court denied this joint motion, addressing separately the legal and factual arguments raised by the parties with regard to those issues. It found that neither PYCA nor Foote refuted the District's proof demonstrating that they are not entitled to an equitable adjustment or delay damages under the prime contract in connection with change order #7 and other work directed by the District. The district court therefore granted the District's motion for summary judgment and denied Foote's and PYCA's joint motion for summary judgment. The court also granted O&W's motion to dismiss the District's cross claim. The court then entered final judgment in the case, and PYCA and Foote separately appealed the district court's decisions.[17] PYCA also appealed the district court's extension of sovereign immunity to O&W. Finally, the District appealed the district court's denial of its motion to amend should we reverse on Foote's amendment issue. We exercise jurisdiction over this case pursuant to diversity of citizenship. 28 U.S.C. § 1332.

## II

We exercise *de novo* review of the grant of a summary judgment. See Boyd v. State Farm Ins. Cos., 158 F.3d 326, 328 (5th Cir. 1998). Summary judgment shall be entered in favor of the moving party if the record, taken as a whole, "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (holding that the motion must

---

[17] Foote also appealed the district court's May 5, 1994 order striking portions of Foote's amended cross-claim. See supra note 15.

demonstrate that there is no genuine issue of material fact as to any element of the claim). A factual dispute is "genuine" where a reasonable jury could return a verdict for the nonmoving party. See Crowe v. Henry, 115 F.3d 294, 296 (5th Cir. 1997); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (holding that a material fact is one that might affect the outcome of the case under the governing law). If the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, then there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 547, 597 (1986). All doubts shall be resolved in favor of the nonmoving party, and any reasonable inferences shall also be drawn in favor of that party. See Huckabay v. Moore, 142 F.3d 233, 238 (5th Cir. 1998).

### III

Following our opinion in PYCA I, Foote's only unresolved claims are ones for delay damages, a refund of liquidated damages assessed by the District, and an indemnity claim against the District for claims PYCA asserts against Foote.[18] We address the first two issues in this Part of our opinion and resolve the final claim in conjunction with the District's cross-claim at Part IV.

### A

The argument with Appellants' contention that they are entitled to a 59-day extension of time and additional compensation for delays and disruptions caused by the District. The District contends that Foote's delay claim is controlled by Paragraph CA.13 ("CA.13") of the prime contract, which it suggests operates as a "no damage for delay" clause. CA.13 provides, in pertinent part:

---

[18] We note that, while both Foote and PYCA raise these issues in some form in their briefs before this court, the claims are primarily Foote's and will be treated as such in this opinion.

No extension of time will be given for ordinary or foreseeable delays, inclement weather, or accidents, and the occurrence of such will not relieve the Contractor from the necessity of . . . completing the Work within the stipulated time limit.

If delays are caused by acts of God, acts of Government, unavoidable strikes, extra work, or other causes or contingencies clearly beyond the control or responsibility of the Contractor, the Contractor may be entitled to additional time to perform and complete the Work, *provided that the Contractor shall, within (10) ten days from the beginning of such delay notify the Owner in writing, with a copy to the Engineer, of the cause and particulars of the delay*. Upon receipt of such notification, the Owner shall review and evaluate the cause and extent of the delay. If, under the terms of the AGREEMENT, the delay is properly excusable, the Owner will, in writing, appropriately extend the time for completion of the work . . . *The Contractor agrees that he shall not have or assert any claim for nor shall he be entitled to any additional compensation or damages on account of such delays*.

(emphasis added). The District contends that CA.13 is similar to "no damages for delay" clauses commonly used in government contracts, both on the state and federal level. See United States ex rel. Straus Sys., Inc. v. Associated Indem. Co., 969 F.2d 83 (5th Cir. 1992); cf. Wood v. United States, 258 U.S. 120 (1922) (holding that no-damages-for-delay clause barred contractors from recovering damages for delays caused by government); Edward E. Morgan Co. v. State Highway Comm'n, 54 So.2d 742 (Miss. 1951) (affirming entry of judgment in favor of Mississippi State Highway Commission in light of construction specifications providing in part that a contractor waives all claims for interference, delay or damages).

Although the general rule in our cases provides that a no-damages-for-delay clause is enforceable at law,[19] the rule is subject to the following exceptions: (1) where the delay was not contemplated by the parties to the contract; (2) where delay is caused by bad faith or active interference; and (3) if the delay is tantamount to an abandonment of the contract. See E.C. Ernst,

---

[19] Although we of course apply Mississippi law to the instant dispute insofar as the tort claims are concerned, we look for guidance to earlier cases from this court for general rules concerning the construction of "no-damages-for-delay" clauses.

13

Inc. v. Manhattan Constr. Co. of Texas, 551 F.2d 1026, 1029 (5th Cir. 1977). We previously addressed PYCA's claim that the District engaged in intentional interference of contract and held that that action could not proceed. See PYCA I, 81 F.3d at 1419-20. We also find that, in light of various contractual agreements and EPA regulations providing for equitable adjustments based on objective pricing criteria, the delay caused by the pricing dispute was manifestly foreseeable. Furthermore, neither PYCA nor Foote presents a compelling argument that the District's actions with respect to PYCA's equipment were taken in bad faith, and no one argues that they constituted an abandonment of the contract. Accordingly, under the Ernst test, we find that no exceptions to the general rule upholding no-damages-for-delay clauses apply.

Alternatively, Foote contends that CA.13 is not a "no damage for delay" clause and does not exclude delays caused by the District or O&W, but we again disagree.[20] CA.13 plainly includes delays caused by "extra work, or other causes or contingencies clearly beyond the control or responsibility of the Contractor." Paragraph CA.25 further provides that "[t]he Contractor shall perform any *extra work* (work in connection with the Contract but not provided for herein) when and as ordered in writing by the Engineer . . ." (emphasis added). Contrary to Foote's argument, then, CA.13 does not exclude delays caused by the District or O&W. To obtain an extension of time, Foote was thus required to comply with CA.13 as written by notifying the District in writing "within (10) ten days from the beginning of such delay."[21]

---

[20] Even though we have held that "no damage for delay" clauses are exculpatory and can lead to unduly harsh results and must be strictly construed, see Ernst, 551 F.2d at 1029, we find here that the plain and unambiguous language of CA.13 supports the district court's conclusion that Foote is barred from any monetary recovery from the District.

[21] As an aside, we find unavailing Foote's argument that CA.13 does not adequately identify the party to which the exclusion of liability is applicable. Foote contends that, because the contract

14

Foote advances several alternative arguments in support of its contention that CA.13 should not control this case.

**1**

Foote first opines that the District's reliance on the no-damage-for-delay clause as a defense is barred because the District failed to raise this affirmative defense in its answer to Foote's cross-claim. Foote relies on Federal Rule of Civil Procedure 8(c), which requires that parties specifically plead "any . . . matter constituting an avoidance or affirmative defense." FED. R. CIV. P. 8(c). Foote also cites Tacon Mech. Contractors, Inc. v. Grant Sheet Metal, Inc., 889 S.W.2d 666 (Tex. Ct. App. 1994), in which a Texas court barred a contractor's attempt to invoke a no-damages-for-delay clause where the party did not affirmatively plead the defense as required by Texas rules of procedure. See 889 S.W.2d at 671. The District in opposition cites Associates Commercial Corp. v. Parker Used Trucks, Inc., 601 So.2d 398 (Miss. 1992), where the Mississippi Supreme Court held that an assignor of a retail sales contract effectively preserved its defense that the assignee's demand for repurchase of the contract was untimely by making a general denial to the assignee's allegations. See 601 So.2d at 403. The District also relies on United States ex rel. H&S Indus., Inc. v. F.D. Rich Co., Inc., 525

does not specifically excuse delays caused by the Owner (the District) or the Engineer (O&W), the district court's interpretation of the clause as providing no damages for delay is incorrect. Foote directs us to several Mississippi Supreme Court cases which it posits support its position. See Heritage Cablevision v. New Albany Elec. Power Sys., 646 So.2d 1305, 1313 (Miss. 1994); Cherry v. Anthony, Gibbs, Sage, 501 So.2d 416, 419 (Miss. 1987); Johnson v. Board of Trustees of Mississippi Annual Conference, 492 So.2d 269, 276 (Miss. 1986). None of these cases involves a no damage for delay clause, however; they each merely recite hornbook law that a court looks to the language of the contract when interpreting a document's meaning, and not to the debatable intent of the parties. We do not disagree with that formulation of Mississippi contract law, but we believe it beyond peradventure that, in the instant case, the prime contract clearly contemplates that CA.13, in conjunction with other recitals in the contract, functions as a no-damage-for-delay clause.

F.2d 760 (7th Cir. 1975), in which the Seventh Circuit held that the availability of a no-damages-for-delay defense was not waived for failure of the contractor to affirmatively plead the defense, but was a matter to be resolved by interpreting the provisions of the contract as a whole. See 525 F.2d at 767.

Although Tacon reaches a different conclusion based on Texas procedural rules, we are not bound by that decision; we do not even find the ruling persuasive given the facts of this case. Instead, we hold that the view set forth by Associates Commercial and H&S Industries is the better one: where a defense is bound up in the respective rights of the parties in light of the contract as a whole, a party lodging a general denial of contractual liability need not identify a specific contractual provision in its answer or responsive pleading to avoid waiver.[22] This result is particularly compelled by the fact that Foote seeks relief through a construction of the contract *as a whole*. The District cannot fairly be prevented from invoking a part of the contract to defend against Foote's claims. The District thus has not waived its right to rely on CA.13 as a basis to defend against Foote's cross-claims.

In addition, we held last year that, while "a defendant is supposed to raise an affirmative defense as a basis for summary judgment when the motion for summary judgment is in the initial pleading tendered by the defendant[,] . . . where the matter is raised by the trial court that does not result in unfair surprise, technical failure to comply precisely with Rule 8(c) is not fatal, and in such a situation a court may hold that the defense was not waived." McConathy v. Dr. Pepper, 131 F.3d

---

[22] The District further contends that issues involving ambiguous contracts need not be specifically pled, citing Century 21 Deep South Properties, Ltd. v. Keys, 652 So.2d 707, 717 (Miss. 1995). As noted by Foote, the instant dispute does not involve an issue of contractual ambiguity. The case's holding, however, correctly states the proposition urged by the District, that is, that a defense that a claim is unenforceable under the terms of a contract need not be affirmatively pled.

558, 562 (5th Cir. 1998) (citations and internal quotations omitted).  We find that the district court's acceptance of the District's motion was not error.

**2**

PYCA and Foote further contend that, since other portions of the prime contract provide a procedure for asserting an additional claim against the District for monetary damages, CA.13 is not a no-damages-for-delay clause.  We find that this position is not supported by the contract documents.  The plain language of CA.13 expressly and unambiguously limits the remedy for delay to an extension of time and bars the contractor from any additional compensation.

We find astonishing that PYCA and Foote actually bother to argue this point.  Because of the nature of the risks associated with complex construction, such clauses are common in the construction industry, and PYCA and Foote, as experienced public contractors, surely are aware of this fact.  In Strauss Systems, we considered the viability of a similar clause which allowed for an extension of time for completion should the Owner cause a delay.  See 969 F.2d at 84.  In another clause of the same contract, the subcontractor expressly accepted the predetermined compensation for its services as sufficient "for all loss or damage arising out of the nature of the work . . . or from any unforeseen or unknown difficulties . . . or obstructions which may arise . . . and for all risks of every description connected with the work."  Id.  This court, applying Texas law, held that the subcontractor was limited solely to an extension of time as compensation for the delay.  See id. at 85-86.  We reasoned

> Contract provisions indicating that the delay was within the contemplation of the Parties have been found to be sufficient to preclude recovery of damages for delay in a construction contract.  Parties to a contract might foresee or consider the possibility of delay and contractually provide for a remedy to be applied upon such occurrence.  It is not necessary that exclusion of delay damages be express.  A provision in the contract for an extension of time in case of delay caused by the contractor has been

17

held to afford the subcontractor an exclusive remedy, precluding the recovery of damages from the contractor.

Id. (citation and internal quotation omitted). We similarly find today that the provision at issue in this contract, read together in light of the contract as a whole, demonstrates that Foote's and PYCA's remedy for delay was effectively limited by CA.13 to preclude any additional compensation or damages.[23]

**3**

Next, PYCA and Foote argue that, assuming that CA.13 operated as a no-damages-for-delay clause, the clause is void as against Mississippi public policy. They find support for this conclusion in Section 31-5-41 of the Mississippi Code, which provides that

> **"Hold harmless" clauses in construction contracts are void; exceptions.**
>
> With respect to all public or private contracts or agreements, for the construction, alteration, repair or maintenance of buildings, structures, highway bridges, viaducts, water, sewer or gas distribution systems, or other work dealing with construction, or for any moving, demolition or excavation connected therewith, every covenant, promise and/or agreement contained therein to indemnify or hold harmless another person from that person's own negligence is void as against public policy and wholly unenforceable. This section does not apply to construction bonds or insurance contracts or agreements.

MISS. CODE ANN. § 31-5-41 (Supp. 1996).

The District contends that this section does not apply to CA.13 because CA.13 is not a hold-harmless clause. The District suggests that CA.13 is "nothing more than an agreement between the

---

[23] Foote draws our attention to Mississippi Transportation Comm'n v. SCI, Inc., 717 So.2d 332 (Miss. 1998), a case in which a jury awarded monetary damages for breach of contract to a highway contractor notwithstanding the presence of a "no-damages-for-delay" clause. The case is inapposite because the contractor's claim was for breach, not delay. See 717 So.2d at 338-39. The court found that the Commission's actions in breaching the contract were wholly independent of the actions that the "no-damages-for-delay" clause was designed to protect. See id. at 339.

parties as to the rights of the parties based on delays" and is thus consistent with another principle of public policy set forth in Edward E. Morgan. In Edward E. Morgan, a contractor sued the Mississippi Highway Commission for damages stemming from the commission's alleged failure to arrange for prompt removal of electric poles along the route of construction. The contract at issue expressly incorporated standard specifications for road and bridge construction, adopted by the Mississippi State Highway Department and approved by the Commissioner of the United States Public Roads Administration. See Edward E. Morgan, 54 So.2d at 744. The government specification barred claims for delay and, similar to the clause in Strauss Systems, contained the following provision:

> Scope of Payment. The compensation, as herein provided, constitutes full payment for the complete work, including all material, labor, tools, and equipment necessary for performing all work contemplated and embraced under the contract; for all loss or damages arising out of the nature of the work; for all loss from the action of the elements, except as otherwise provided; for any unforeseen difficulties or obstructions which may arise or be encountered during the prosecution of the work until its final acceptance by the Engineer; for all risks of every description connected with the prosecution of the work; also, for all expenses incurred by or in consequence of suspension or discontinuance of the work as herein specified.

Id. The Mississippi Supreme Court found that the specifications were binding and held that the contractor's delay claims were barred. See id.

For the above reasons, we hold that CA.13, which operates to limit a contractor's (or subcontractor's) rights based on delay, is valid as drafted and is not void as against Mississippi public policy. Even though Morgan was decided many years before the passage of § 31-5-41, it is clear that CA.13 is not a hold-harmless clause, but rather details an agreement between sophisticated parties

for remedying delay caused by an Owner. CA.13 merely allows contractors to limit their losses from delay by seeking an extension of time.[24]

**4**

Fourth, Foote and PYCA contend that, assuming that CA.13 operated as a no-damages-for-delay clause, EPA regulations promulgated at 40 C.F.R. §§ 33.1005 through 33.1145 (1992) nevertheless establish Foote's right to compensation as well as an extension of time for delays.[25] Foote and PYCA further argue that these regulations supersede any conflicting provision in the prime contract. Specifically, Foote and PYCA rely in part on § 33.1030, the model subagreement clause. The provision reads as follows in pertinent part:

> Changes. If any change under this clause causes an increase or decrease in the contractor's cost or the time required to perform any part of the work under this contract, whether or not changed by any order, the recipient shall make an equitable adjustment and modify the subagreement in writing . . .

40 C.F.R. § 33.1030, ¶ 3(a)(4).[26] In addition to the "Changes" clause, Foote and PYCA further rely on the following regulation:

> Suspension of Work. If the performance of all or any part of the work is suspended, delayed or interrupted for an unreasonable period of time by an act of the recipient in administration of this subagreement, or by the recipient's failure to act within the time specified in this subagreement (or if no time is specified, within a reasonable time), the recipient shall make an adjustment for any increase in the cost of performance of this

_____

[24] In any event, the record in this case reflects that the delay here did not stem from negligent conduct by O&W or the District, so § 31-5-41 would be inapposite even if CA.13 were a hold-harmless clause.

[25] The contract was subject to certain EPA Special Conditions because it involved the receipt of a federal grant.

[26] "Recipient" is defined as "[a]ny entity which has been awarded and accepted an EPA assistance agreement." 40 C.F.R. § 33.200. The recipient in this case is the District.

subagreement (excluding profit) necessarily caused by such unreasonable suspension, delay or interruption and modify the contract in writing.

40 C.F.R. § 33.1030, ¶ 5(b).

Foote urges that these special conditions are "virtually identical" to those incorporated into construction contracts with the federal government and directs us to a series of inapposite federal and state cases that purportedly favor its position. See, e.g., Southwestern Engineering Co. v. Cajun Elec. Power Coop., 915 F.2d 972, 976 n.1 (5th Cir. 1990) (interpreting a contract in determining entitlement to overhead costs incurred after a contract was canceled prior to conclusion, and not addressing EPA regulations or conflicting provisions); Aetna Cas. & Sur. Co. v. Doleac Elec., Inc., 471 So.2d 325 (Miss. 1985) (addressing damages recoverable as a consequence of contractual breach, not EPA regulations or conflicting provisions). Although Foote makes a grandiloquent effort, it ultimately ignores the decisive regulation: CA.13 is not superseded by EPA regulation because § 1005(b) permits the District to add additional contractual requirements. The EPA Special conditions are *minimum* requirements, and the District is at liberty to add more stringent conditions if it so chooses. As permitted by EPA regulations, the disputed clauses in the prime contract, relating to changes in the work and extra work, were requirements *in addition to* existing regulations. These requirements were not superseded, and, thus, the Special Conditions and CA.13 are not in conflict.

We must observe that PYCA's and Foote's attempt to cover all the bases in this case is not a timorous one. Unfortunately, they attempt to cherry-pick their way through the EPA regulations, selecting certain provisions that support their position while manifestly ignoring others that damage

21

their case. In the end, Appellants merely place their Foote in their mouth; excising one regulation from the context provided by its companions is patently disingenuous.[27]

For the reasons set forth above, we agree with the district court that CA.13 should be enforced according to the agreement of the parties. Accordingly, we find that changes made within the scope of the contract preclude damages for delay other than for a timely request for an extension

---

[27] For instance, the EPA Special Conditions, in another subsection also incorporated into the prime contract, prohibit a contractor from making a claim for delay damages. See 40 C.F.R. § 33.1030, ¶ 3(a). The Supreme Court held as much in United States v. Rice, 317 U.S. 612 (1942), a construction case on appeal from the Court of Claims. The Court there addressed changes clauses similar to those used in this case. See id. In Rice, the contract specifications and building site were changed because of unsuitable soil conditions, thereby rendering the contractor unable to begin work until five months later than the anticipated date. Upon the completion of the work, the contractor was paid only the contract price. The plaintiff, a receiver for the contractor, sued the federal government for delay damages, including overhead expenses accumulated during the delay. See Rice, 317 U.S. at 62-64. The Supreme Court essentially held that the "increase or decrease of cost" language in the clauses was not broad enough to include consequential damages for delay. See id. at 66-67.

Subsequent decisions have followed the analysis in Rice when construing changes clauses. See, e.g., Massman Constr. Co. v. Tennessee Valley Auth., 769 F.2d 1114, 1125 (6th Cir. 1985) (denying under Rice equitable adjustment for profit based on delay). The Ninth Circuit read Rice as follows:

> The provisions of the prime contract here involved relating to changes are standard clauses in government construction contracts. They have been considered in many decisions which have consistently held that under them the Government has the right to make changes within the general scope of the contract or necessitated by changed conditions and incur no liability for delays resulting from such changes except for an equitable extension of the time for performance.

McDanial v. Ashton-Mardian Co., 357 F.2d 511, 514-15 (9th Cir. 1966).

Foote does not include in its basket of cherries this settled law on the prohibition of delay damages in federal contracts. Foote would instead have us conclude that the "Rice Doctrine" is "an antiquated legal theory which has been used to preclude recovery of costs associated with delays as a consequence of Government directed changes" and is, therefore, "dead." In support of this theory, Foote cites a single opinion from the Board of Contract Appeals and the opinion of an author in a 1991 law review article. While we need not reach this question, since we conclude that the EPA Special Conditions were not in conflict with the prime contract, we note Foote's hubris in pursuing this alternative argument.

22

of time. Foote's failure to submit a timely claim for an extension of time on PYCA's behalf operated to bar the relief sought for delay.

**B**

Foote seeks to recover or reduce the $57,600 in liquidated damages assessed by the District under the contract. The liquidated damages provision, Paragraph CA.14 ("CA.14"), reads as follows:

> In case the contractor fails to complete the Work satisfactorily on or before the date of completion fixed herein as or as duly extended as hereinbefore provided, the Contractor agrees that the Owner shall deduct from the payments due the Contractor each month the sum set forth in Table A at the end of this section for each calendar day of delay, which sum is agreed upon not as a penalty, but as fixed and liquidated damages for each day of such delay. If the payments due the Contractor are less than the amount of such liquidated damages, said damages shall be deducted from any other moneys due or to become due the Contractor, and, in case such damages shall exceed the amount of all moneys due or to become due the Contractor, the Contractor or his Surety shall pay the balance to the Owner.

Table A referenced in the section provided for liquidated damages of $1,200 "for each calendar day of delay in completion time." Foote contends that CA.14 is punitive in nature and thus unenforceable as a matter of law. Foote and PYCA further contend in their joint itemization that the District suffered no actual damages chargeable against them or, in the alternative, that the amount of damages assessed under Paragraph CA.12 was clearly excessive and operated as a penalty.

Of course, the starting point in the analysis is the plain terms of CA.14, which state that the $1,200 amount "is agreed upon not as a penalty, but as fixed and liquidated damages for each day of such delay." Such clauses are construed by Mississippi courts with caution. With regard to liquidated damages clauses, the Mississippi Supreme Court provides the following general guideline: "Whether a sum stipulated is a penalty [a disfavored approach] or liquidated damages [an acceptable approach] is a question of construction to be decided upon the terms and inherent circumstances of each particular contract, judged at the time of the making of the contract, not as at the time of the

23

breach." Hertz Comm. Leasing Div. v. Morrison, 567 So.2d 832, 836 n.3 (Miss. 1990) (citation omitted). It follows that, if the sum certain of liquidated damages is not extravagant or unconscionable under objective standards existing at the time of the agreement, the District need not ultimately suffer actual damages for CA.14 to be an enforceable provision.

"Ordinarily, the intention of the parties will control as to whether a provision in a contract is for a penalty or for liquidated damages." Continental Turpentine & Rosin Co. v. Gulf Naval Stores Co., 142 So.2d 200, 209 (Miss. 1962) (citation omitted). Such clauses are deemed unenforceable penalties generally only in limited cases where (1) "the actual damage resulting from the breach may be readily ascertained," or (2) "the contract discloses no intention to fix the sum as liquidated damages or leaves the intention in this regard in doubt." Id. (citation omitted). In such cases, the contested clause is "not a genuine . . . pre-estimate of liquidated damages, but was in fact a measure to police and terrorize the [adversely affected party]." Id. (citation and internal quotation omitted).

The inherent difficulty of affixing actual damages flowing from a potential breach is a factor favoring the use of liquidated damages clauses. See Daniel Int'l Corp. v. Fischbach & Moore, Inc., 916 F.2d 1061, 1066-67 (5th Cir. 1990); Dahlstrom Corp. v. State Hwy. Comm'n, 590 F.2d 614, 615-16 (5th Cir. 1979); Board of Trustees of State Institutions of Higher Learning v. Johnson, 507 So.2d 887, 889-90 (Miss. 1987) (following Dahlstrom). The District demonstrates, and Foote does not deny, that it could not foresee what precise damages would result from Foote's delay, especially in light of the unforeseeable environmental damages associated with the risk of being unable to treat wastewater adequately. It is well-established that the mere fact that the amount of damages ultimately suffered by a party was less than the amount payable under the liquidated-damages clause does not, standing alone, permit courts to recharacterize a liquidated damages provision as a penalty.

24

See Daniel Int'l Corp., 916 F.2d at 1066; see also Advance Tank & Const. Co. v. City of DeSoto, 737 F. Supp. 383, 384-85 (N.D. Tex. 1990) (upholding pre-estimate of $500 per day as a valid liquidated damages provision). The district court found that, given the nature and circumstances prevailing at the time of the contractual agreement, the amount of damages was not clearly foreseeable, and thus the parties' use of the liquidated damages clause was appropriate.

Foote was free to dispute the feasibility of the amount provided in CA.14 and Table A, but it neither contested the provision nor provided any evidence showing that the provision was not part of its bargain with the District. Instead, Foote argues that damages assessed under CA.14 may, in any event, be reduced in light of CA.34, which expressly permits the District to accept and pay for portions of the work. Under this theory, Foote seeks an equitable adjustment in light of the work actually or partially accepted by the District. The district court found that Foote's request for an equitable adjustment constituted a disguised attempt to adjust the stipulated damages, but no contractual basis for such an adjustment exists. Even if such a contractual basis existed for a reduction of liquidated damages assessed under CA.14, Foote of course waived its right to such a claim by failing to comply with Paragraphs CA.4 ("CA.4") and CA.28 ("CA.28").

The district court found, and we agree, that the District was authorized to assess liquidated damages under CA.14.

## C

Foote contends that its alleged failure to comply with claim provisions in the contract should be overlooked because the District has failed to demonstrate any prejudice as a result of its inaction. Foote further contends that the District is merely invoking a hypertechnical construction of the contract in order to avoid liability regarding actions for which the District is "solely responsible."

25

In Eggers & Higgins & Edwin A. Keeble Assoc., Inc. v. United States, 403 F.2d 225 (Ct. Cl. 1968), the contract at issue gave the contracting officer discretion to consider claims filed after a 10-day deadline had passed.[28] See 403 F.2d at 235. In determining whether the officer abused his discretion in denying a late claim, the Court of Claims reasoned that "certainly prejudice to defendant would be relevant and material in the exercise of such judgment." Id. at 236. The court further reasoned that, if a defendant has suffered "substantial prejudice," the denial of an untimely claim would not be arbitrary, capricious, or an abuse of discretion. Id. Contrasted with the clause at issue in Eggers, CA.4 and CA.28 make timely submission of claims mandatory. By failing to submit a claim in accordance with CA.4, Foote was "deemed to have accepted such . . . determination, or decision as being fair, reasonable, and finally determinative of his obligations and rights under the Contract." CA.4. The district court thus found, and we agree, that Foote cannot escape the consequences of its default by alleging that the District did not suffer prejudice.

We nevertheless find this argument to be Foote's and PYCA's most compelling. Although we have held above that Foote's failure to submit a timely protest to O&W's unilateral change order #7 was not a mere technical defect, we cannot agree with the District that, as a trustee of public funds, it has no authority to pay a claim or adjust a credit absent a formal claim or protest by Foote. Although neither PYCA nor Foote has shown that the District would not suffer prejudice by dispensing funds contrary to the obligation imposed by the prime contract and EPA regulations, we do not believe that a different adjustment, in and of itself, would have been a "breach of the public trust," as the District contends. Indeed, the District's support for this argument, Butler v. Board of

---

[28] The provision read: "Any claim for adjustment under this Section must be made in writing within 10 days from the date the change is ordered or within such longer period as may be allowed by the Contracting Officer." 403 F.2d at 235.

26

Supervisors for Hinds County, 659 So.2d 578 (Miss. 1995), is not on all fours with the instant dispute. In Butler, the Mississippi Supreme Court held that a public agency is immune from contractual liability where a contractor proceeds with unauthorized work. See 659 So.2d at 579. In this case, no party disputes that the District actually authorized the work undertaken by PYCA; consequently, "the policy of protecting the public funds" articulated by Butler is not automatically paramount to the individual rights asserted by PYCA. Butler simply does not govern this case.

While we conclude that the District suffered no prejudice by Foote's failing to file a formal, written protest, that conclusion, however, does not end our inquiry. While we might be inclined to construe a contract equitably where a minor failure to comply with a provision occurred, such was not the case here. Change order #7 was issued following a long dispute regarding Reynolds's equipment pricing. Foote unequivocally stated that it understood the notice provisions of the contract and was notified on or about August 7, 1991, regarding the need to dispute the District's action on that date either through further negotiation or by filing a formal protest. Foote failed to undertake either action. We cannot simply reverse the district court because we find that the District was not directly prejudiced by Foote's inaction; Foote is a sophisticated party that understood the provisions of the contract for which it had bargained. In light of this fact, we cannot reward Foote for its failure; consequently, we do not find the District's lack of prejudice to be grounds for reversal.

**IV**

The District, in its cross-claim, argues that Appellants waived any rights they had under the prime contract by failing to file a formal, written protest with the District. The District suggests that this failure precludes any relief, even an extension of time for completion of the work. As support for its position, the District invokes CA.28, which reads as follows:

27

If the Contractor makes claim for any damages alleged to have been sustained by breach of contract or otherwise, he shall, within ten (10) days after occurrence of the alleged breach or within ten (10) days after such damages are alleged to have been sustained, whichever date is earlier, file with the Engineer a written, itemized statement in triplicate of the details of the alleged breach and the details and amount of the alleged damages. The Contractor agrees that unless such statement is made and filed as so required, his claim for damages shall be deemed waived, invalid and unenforceable, and that he shall not be entitled to any compensation for any such alleged damages. Within ten (10) days after the timely filing of such statement, the Engineer shall file with the Owner one copy of the statement, together with his recommendations for action by the Owner.

The District further contends that, to avoid waiving its claims, Foote was similarly required to submit to the District a protest, stating "clearly and in detail [its] objections, the reasons therefor, and the nature and amount of additional compensation, if any, to which [it] claims [it] will be entitled thereby."[29]

The District contends that Foote's request for delay and other damages has been waived by Foote's failure to comply with the express terms of the contract. In support thereof, the District cites Galin Corp. v. MCI Telecom. Corp., 12 F.3d 465 (5th Cir. 1994). Although Foote contends that Galin is inapposite because it applies New York law, we believe that Galin stands for the useful proposition that, where the basis for waiver is unambiguously set forth in the contract, the provision is enforceable. See 12 F.3d at 470. This conclusion is not at odds with the law of Mississippi regarding waiver. See, e.g., Barbee v. United Dollar Stores, Inc., 337 So.2d 1277, 1279-80 (Miss. 1976) (defining waiver as "the voluntary and intentional relinquishment of a known right"); Morgan v. United States Fid. & Guar. Co., 222 So.2d 820, 830 (Miss. 1969) ("[A] promise to waive may be

---

[29] In its January 18, 1994, Memorandum Opinion, the district court noted that the EPA Special Conditons require that a contractor file a claim for equitable adjustment with the District within 30 days of the change at issue. Cf. 40 C.F.R. § 33.1030, ¶ 3(a)(5). A contractor is generally barred, however, from submitting any claim for equitable adjustment if the claim is made after final payment to the contractor. See ¶ 3(a)(6).

embodied in an express contract or in a contract implied by the conduct of the parties."); cf. Reliance Ins. Co. v. First Mississippi Nat'l Bank, 263 So.2d 555, 560 (Miss. 1972) (holding that a surety could not avail itself of the provision of a construction contract where the city had waived its rights by failing to serve the contractor with written notice or exercise options under the contract).

As factual support for its argument that Foote's claims are waived, the District argues that Foote did not challenge change order #7 by requesting an extension of time to complete the construction project or file a written protest with O&W or the District in accordance with CA.13, CA.28, and CA.4. Although Foote concedes that it did not comply with the foregoing procedures, Foote argues that the District had actual notice of its claim and cannot assert a technical argument to defeat it. We cannot understand how Foote can argue that the contract's formal protest procedures, which required that it articulate with reasonable certainty and on a timely basis the nature of its claims, did not control. CA.28, as well as the other notice provisions of the contract, most certainly provides a basis for a contractually enforceable waiver under the contract.

Foote did not comply with the contractual provisions. Unexecuted copies of the change order providing for an additional increase in the District's credit were sent to Foote on or about July 3, 1991. Foote forwarded copies of the change order to PYCA, and PYCA objected to it. On July 22, 1991, Foote rejected and returned copies of the unexecuted change order to O&W. In response, on August 7, 1991, the District notified Foote that it was executing the change order as a "unilateral change order for credit to the owner." The District informed Foote that it was rejecting all delay-related claims but advised Foote that it could seek a remedy through renewed negotiation or by following the provisions of the contract documents.

No party disputes that the amount of the credit determined and executed by O&W constituted a decision by the project engineer under Paragraph CA.24 which triggered the 10-day time period under CA.28 and CA.4 in which to file a protest with O&W and the District. Although a protest by PYCA had been submitted months earlier (on February 1, 1991), Foote did not file a timely protest to the unilateral change order as executed. Instead, on August 19, 1991, Foote wrote a letter to O&W in which it challenged the District's authority to issue the unilateral change order. While this letter represented a general challenge to the District's authority, it did not constitute a formal objection as required by CA.4 or CA.28.

Instead, Foote contends that compliance with CA.4 and CA.28 would have been "a useless act." Foote contends that previous communications with O&W were sufficient to comply substantially with the notice requirements under the contract. The record, however, contains a series of letters memorializing communications and disputes between PYCA, Foote, and the District regarding the pricing of electrical equipment supplied by Reynolds, and these letters indicate an awareness by both sides to the dispute that the contractual provisions in CA.28 governed this controversy. The tenor of the communications between the parties further establishes that PYCA and Foote knew, or should have known, that the requirements of notice under CA.4 and CA.28 applied to all decisions made by the District. The mere fact that previous communications between the parties were related, in whole or part, to matters finally decided in change order #7 does not provide an exception to the contract's notice provisions. The pattern of communications and disputes leading up to and including the District's execution of the unilateral change order on August 7, 1991, put Foote on notice that a formal protest was required. Foote's undisputed failure to lodge a formal

protest to the execution of the change order does not constitute substantial compliance with the contract.

In the alternative, Foote argues that claims it submitted on PYCA's behalf should be considered notwithstanding that Foote did not comply with CA.4 and CA.28 in submitting them.[30] Those claims include costs associated with a variety of electrical equipment and for delay. As we have discussed elsewhere in this opinion, each of these claims was barred by the prime contract. PYCA tries in vain to keep its Foote in the door by arguing that the District's denial of its claims operated as a waiver of the contractual requirements of CA.4 and CA.28. PYCA's claims would have been precluded by the prime contract even if they were not untimely.

For these reasons, we find, as did the court below, that Foote's claims—whether tendered as PYCA's claims or its own—are barred from judicial review by CA.4 and CA.28.

## V

Foote filed a cross-claim against the District contending that, if it is liable to PYCA, then the District is liable to Foote. According to PYCA, Foote's claim for indemnity triggers the flow-

---

[30] Foote and PYCA both repeatedly assert that the District had actual notice of PYCA's claim, even if Foote failed to comply with the contractual requirement to present the claim in writing. To this end, Foote draws our attention to Brinderson Corp. v. Hampton Roads Sanitation Dist., 825 F.2d 41 (4th Cir. 1986), a case from a sister circuit which held that the EPA Special Conditions at issue should be applied liberally to avoid injustice. See 825 F.2d at 44-45. While not disagreeing with the Fourth Circuit, we observe that applying the Special Conditions literally in this case will not promote injustice, as Foote seems to argue.

In Brinderson, the court held that, "when the owner has actual or constructive notice of the conditions underlying the claim and an opportunity to investigate, that is sufficient" under the notice provisions of the EPA regulations. Id. at 44 (citation omitted). Here, even assuming that the District did have constructive notice of PYCA's claims, the District had no opportunity to investigate the central claim—that the adjustment was not equitable—because PYCA and Foote refused to deliver relevant pricing information to the District. As such, if there is any injustice in strictly construing the notice requirement in this case, it has been entirely precipitated by PYCA's and Foote's own actions.

through[31] provisions in PYCA's subcontract, whereby the District, if liable to Foote, would be required to make adjustments that would flow through to PYCA. The District argues that any flow-through benefit available to PYCA by virtue of Foote's privity with the District depends on whether Foote preserved any claims against the District related to change order #7. The District contends that Foote failed to preserve PYCA's rights by submitting a timely written protest against the District for an equitable adjustment in accordance with the prime contract. Hence, according to the District, nothing flows through to PYCA because the District owes nothing to Foote.

The district court's ruling in its January 14, 1994 opinion that Foote did not breach its subcontract with PYCA by merely passing down the District's adjustment to PYCA did not address the separate but closely-related issue whether Foote effectively preserved PYCA's right to challenge that adjustment. As demonstrated below, PYCA's primary difficulty in recovering against the District in this case stems from the undisputed fact that the District issued change order #7 to Foote, not PYCA.

On May 5, 1994, the district court granted the District's motion to strike portions of Foote's amended cross-claim alleging that the District breached its contract by not making equitable adjustments with regard to Foote. The District argues that, consequently, PYCA's claims against the District do not survive because Foote failed to file a timely protest; thus, nothing passes through from PYCA to the District. The District's argument turns on the notion that, given the contractual relationship of the parties, the only entity to which PYCA could turn to for an equitable adjustment

_____

[31] The parties expended much effort in denominating the provision of the contract addressed in this part of our opinion. Both "flow-through" and "flow-down" are offered as terms which most accurately describe the three-way contractual relationship between PYCA, Foote, and the District. For simplicity's sake, we will refer to the rights at issue as "flow-through" rights, with no particular gloss to that term intended.

was Foote, the party in privity with the District. Foote counters that its remaining indemnity claim and the flow-through provisions of the prime contract suffice to preserve any contractual issue with Foote that implicates PYCA's right to recover.

On the issue whether PYCA's claims flow through Foote to the District, PYCA argues that its claim passes through to the District without regard to whether Foote properly preserved its claim. We find that this argument is without merit. For claims to pass through Foote to the District under the EPA Special Conditions, Foote must properly comply with the necessary notice provisions. Under the terms of the contract, the remedies clause clearly applies only when a claim has been properly filed and disallowed. Were this not the case, CA.4 and CA.28 would have no meaning; aggrieved parties could simply ignore the prime contract and present their claims directly for judicial review. Foote and PYCA misapprehend this requirement by attributing an interpretation to the term "flow through" that contradicts the regulations and the terms of the contract as a whole.

The prime contract mandates that the source of control and funding begins with the District as the EPA recipient, with accountability flowing downward in an orderly procedure for lodging claims. To recover equitable relief, PYCA was required by the prime contract and PYCA's subcontract to look to Foote as the source of such relief. Foote, in turn, was required to look to the District. This procedure is embodied in part by the prime contract at Paragraph CA.40 ("CA.40"):

> Liability of Owner. No person, firm or corporation, other than the Contractor, who signed this Contract as such, shall have any interest herein or right hereunder. No claim shall be made or be valid either against the Owner or any agent of the Owner and neither the Owner nor any agent of the Owner shall be liable for or be held to pay any money, except as herein provided . . . .

CA.40 permits only Foote, who signed the contract with the District, to challenge any action taken by the District. Otherwise, "each lower tier subcontractor could bind the District by the terms of a

33

contract to which the [D]istrict is not a party." With the District responsible for overseeing the disbursement of public funds, the process for submitting claims effecting such funds requires that relief "flow down" from the District, with Foote and other similarly-situated contractors subject to accountability for their respective subagreements. Equitable adjustment between parties in privity at each contractual level depends on the terms and circumstances surrounding each agreement; indeed, Foote could have granted an equitable adjustment regardless of whether the District agreed.

As we discussed above, § 33.1030 of the EPA Special Conditions embodies this principle. That section was designed primarily to protect the public treasury from excessive expenditures, not to insulate private contractors whose subagreements may differ from those in the regulations. See Evansville Cement Finishers, Inc. v. Village of New Haven, 766 F. Supp. 692 (S.D. Ill. 1991). The model subagreement suggests as much:

> Since the subagreement is subject to reduction under this clause by reason of defective cost or pricing data submitted in connection with lower tier subagreements, the contractor may wish to include a clause in each lower tier subagreement requiring the lower tier subcontractor to appropriately indemnify the contractor. It is also expected that any lower tier subcontractor subject to indemnification will generally require substantially similar indemnification for defective cost or pricing data submitted by lower tier contractors.

40 C.F.R. § 33.1030, ¶ 8(b). The recommendation that subagreements contain indemnification clauses arises because the contractor, not the District, is generally accountable for defective cost data or pricing in connection with a lower tier subagreement. Foote did not include an indemnification clause in its contract with PYCA.

The record reflects that, although PYCA did not enforce its right pursuant to the EPA regulations to an indemnification provision, PYCA did retain rights in its contract with Reynolds to

34

make changes subject to an equitable adjustment. PYCA's purchase order with Reynolds states in pertinent part:

> Buyer reserves the right to change specifications, such changes to be made only by duly authorized representatives of Buyer. Any differences in costs resulting from changes shall be equitabl[y] adjusted and the Order shall be altered in writing accordingly.

Other portions of PYCA's purchase order with Reynolds also allowed PYCA to cancel the order, except for mere "convenience," subject to certain cancellation charges, including a "reasonable amount for profit." There is no indication that PYCA ever pursued the option of canceling the order or, at the very least, determining what amount of cancellation charges, if any, would apply.

Instead, Foote and PYCA seek to exclude Reynolds's pricing data as entirely exempt from the pricing inquiry. This argument runs aground on § 33.290 of the EPA Special Conditions. These regulations, incorporated into the prime contract, require the District to "conduct a cost analysis of all negotiated change orders and all negotiated subagreements estimated to exceed $10,000." 40 C.F.R. § 33.290. Foote and PYCA attempt to circumvent the EPA Special Conditions by pointing to the district court's January 14, 1994 opinion, which observed that the contract and model subagreement clauses themselves did not expressly permit examination of a supplier's cost data or examining pricing of other suppliers.[32] The procurement pricing requirements were limited to the tier "immediately below the contractor (i.e., subagreements awarded by the contractor)." 48 Fed. Reg. 12,922, 12,924 (1983). Foote and PYCA manifestly disregard, however, the district court's observation that examination *is* allowed when a subcontractor immediately below a contractor has

---

[32] Indeed, the district court noted that 40 C.F.R. § 33.295, one of the EPA Special Conditions, "does not apply to a supplier's procurement of materials to produce equipment, materials and catalog, off the shelf, or manufactured items."

impliedly agreed in his subcontract to be accountable for defective cost or pricing data in accordance with the prime contract. Looking to the written agreements of the parties taken as a whole, the district court found that Reynolds had so agreed.

It is undisputed that Reynolds knew that PYCA was subject to the requirements of § 33.1030, including the provisions for disclosure of records and auditing. Reynolds expressly agreed and represented that "[s]eller shall be aware of the necessity to review the entire contract documents, not just individual sections, to determine the total responsibilities and requirements." This provision mirrored exactly the language in PYCA's agreement with Foote. Reynolds also agreed that "[s]eller is bound to PYCA Industries, Inc. by all terms and conditions of the contract documents as applicable to the material/equipment described herein." Additionally, Reynolds agreed that PYCA could make changes related to the equipment subject to an equitable adjustment. Finally, Reynolds expressly agreed and represented in a rider signed on January 11, 1990, that the equipment "will satisfy all the requirements of the contract documents."[33]

---

[33] As a collateral issue, the district court observed that the prime contract contained an implied covenant of good faith and fair dealing, that is, that no party to any subagreement would take any action to defeat the purpose of the prime contract. See Cenac v. Murry, 609 So.2d 1257, 1272 (Miss. 1992) ("All contracts contain an implied covenant of good faith and fair dealing in performance and enforcement."); cf. Ebasco Servs., Inc. v. United States, 37 Fed. Cl. 370, 382 (Fed. Cl. 1997) ("Every government contract contains an implied covenant of good faith and fair dealing."). Arguably, PYCA, Foote, and Reynolds all violated this implied covenant.

In the case at bar, the change order resulted from PYCA's proposal and tender of electrical equipment furnished by Reynolds. O&W, as the District's representative, had an affirmative duty to make an independent cost estimate and price analysis to verify that the estimate prepared by PYCA was fair and reasonable. The prime contract provided that both PYCA and Foote were accountable for defective cost or pricing data, and that requirement was expressly incorporated into Reynolds's agreement with PYCA. Indeed, PYCA was *required* to obtain the supporting cost data from Reynolds. Because both the prime contract and the various subagreements all provided for equitable adjustments, PYCA was allowed to adjust its contract with Reynolds to reflect the District's determination regarding the pricing of the equipment, but failed to do so.

PYCA's contention now that it was locked into its agreement with Reynolds is arguably not

Reynolds (and thus PYCA) never complied with these regulations. Although PYCA initially made limited disclosures regarding its equipment, those disclosures did not provide complete information. As early as April 1990, PYCA advised its suppliers that changes involving the electrical equipment would be "subject to a federal audit" in accordance with EPA regulations. On January 25, 1991, following the District's submissions on the proposed changes, the DEQ wrote a letter to the District with regard to change order #7 stating that the cost and pricing information was insufficient and that additional information was required. On March 11, 1991, the DEQ again addressed the feasibility of change order #7, advising the District that the pricing information must be substantiated pursuant to EPA regulations.

Reynolds refused to submit the information requested, and Foote advised the District of Reynolds's position on April 26, 1991. The record reflects that, when the District did not receive the information, O&W obtained a quote from Square D Company ("Square D") which was used in adjusting the amount due to the District. O&W then reported to the District that PYCA and Foote could have negotiated a lower price with their suppliers, at an early point in the project, which would have yielded "a significant savings to the District as originally promoted [by PYCA and Foote]." Finding that PYCA and Foote failed in this regard, O&W's adjustments to Foote's contract reflected "the amount of credit if negotiations had been handled properly by the contractor." On July 2, 1991, the EPA approved the change order based on O&W's determination using Square D's quote.

made in good faith.

37

PYCA challenges O&W's pricing calculations based on "estimates" instead of "actual cost data."[34] PYCA further contends that its "actual" cost is presumed to be reasonable without regard to whether the data supporting it is inaccurate or defective and that it "provided the District with all of the cost information it received from its equipment supplier." While all of these assertions bear some truth, PYCA's argument fails to account for Reynolds's failure to disclose, pursuant to contract, its cost information to PYCA, which rendered PYCA's disclosure incomplete. PYCA instead argues that it was placed in the "inequitable position of receiving less funds for the equipment than it was required to pay its supplier," but this result was hardly inevitable. PYCA, for whatever reason, simply failed to assert its rights under its contract with Reynolds. The District contends that allowing PYCA's claims to flow through to the District under these circumstances would violate the terms of the prime contract because the District would be unable to contest Reynolds's pricing of the electrical equipment. The district court found, and we agree, that PYCA's decision to concur in Reynolds's refusal to comply with the disclosure and audit requirements forecloses any attempt by PYCA to argue in Reynolds's stead that the District's adjustment was inequitable.

For the reasons set forth above, we conclude that PYCA's claims cannot flow through to the District under circumstances that would produce a result not contemplated by the contract or pertinent EPA regulations.

---

[34] PYCA challenges the District's authority to make any adjustments that effect a supplier's profit margin, but we find that the District clearly retained the authority to reduce negotiated profits embedded in Foote's contract and that Foote could adjust PYCA's contract accordingly. See, e.g., 40 C.F.R. § 33.1030, ¶ 8(a) (requiring that any price including profit negotiated in connection with a subagreement may be reduced if incomplete or inaccurate). Additionally, as we noted above, the prime contract and PYCA's subagreement with Reynolds also specifically gave PYCA the right to demand an equitable adjustment from Reynolds. Consequently, we find no support for Foote's and PYCA's thesis that the District could not question Reynolds's pricing.

PYCA and Foote next argue that, in any event, the District's unilateral adjustment pursuant to change order #7 was inequitable. We disagree. Foote's and PYCA's argument is largely based on their misconstruction of the contract and the respective obligations of the parties, and we find their contentions to be without merit.

At the outset, we observe that a central, guiding principle underlying equitable relief is that "[h]e who seeks equity must do equity." Grant v. State, 686 So.2d 1078 (Miss. 1996). In Mississippi, this principle applies in commercial transactions as well as private actions against the government where parties seek the benefit of an equitable ruling. See, e.g., Pongetti v. Bankers Trust Sav. & Loan Ass'n, 368 So.2d 819, 824 (Miss. 1979); Magnolia Fed. Sav. & Loan Ass'n v. Randal Craft Realty Co., Inc., 342 So.2d 1308, 1313 (Miss. 1977); Homes, Inc. v. Anderson, 235 So.2d 680, 683 (Miss. 1970); Mississippi State Hwy. Comm'n v. Spencer, 101 So.2d 499, 504-05 (Miss. 1958). As we will demonstrate, Appellants shot themselves in the Foote by not performing equitably with respect to the District.

The District contends that the Square D quote was necessary because neither Foote nor PYCA was diligent in negotiating a fair price for the electrical equipment. PYCA, on the other hand, argues that the District's reliance on Square D's price quotation was arbitrary and self-serving. Yet nowhere in the record does PYCA suggest an alternative approach that the District could have used to exercise its rights under the contract. Instead, PYCA merely avers that its definition of an "equitable price" is the preferable one; we note, however, that PYCA's construction of the contract—disallowing review of the sort undertaken by the District and O&W—would have placed

little or no burden on O&W in ascertaining whether the pricing of the equipment installed by PYCA was reasonable, defective, or incomplete.

In addition, we agree with the district court that the mere fact that complete information regarding Reynolds's pricing was not available to the District indicates that neither PYCA nor Foote can prevail on an equitable theory. Because Foote and PYCA refused to supply necessary information, the District had to expend additional resources in an attempt to assure compliance with EPA regulations, including seeking out and relying on the Square D quote. PYCA was responsible under the contract and the regulations for producing complete information regarding the equipment it had purchased and for doing so in a timely fashion; its failure to comply with these provisions cannot now be addressed by petitioning the court for equitable relief.[35] The district court could only evaluate the District's determination based on information before it "at the time of submission," 40 C.F.R. § 33.1030, ¶ 8(a), namely, the terms of its contract and of PYCA's contract with Reynolds.

---

[35] We note with irony that Reynolds agreed in its contract with PYCA to allow an adjustment to its price subject to an equitable adjustment imposed on PYCA by Foote or the District. Reynolds then, of course, declined to provide the information necessary for such an equitable adjustment to benefit PYCA. Foote's and PYCA's having agreed with Reynolds, however, the consequences of Reynolds's failure to disclose is imputed to them. Simply put, PYCA's failure to assert rights against Reynolds that were clearly available to PYCA under the contract and PYCA's subagreement prevented an equitable adjustment. Such a failure amounts to a waiver of any equitable remedy. See, e.g., Barrow Utils. & Elec. Co-op, Inc. v. United States, 20 Cl.Ct. 113, 121 (Cl. Ct. 1990); Grant, 686 So.2d at 1089; Marks v. Toney, 18 So.2d 452 (Miss. 1944).

Naturally, PYCA disputes this characterization of its contract with Reynolds, arguing that the district court erred by holding "that PYCA should have breached its contract with Reynolds." We disagree with PYCA's reading of the district court's opinion. At no point did the court below sanction a wilful breach of contract or opine that PYCA could cancel its contract with Reynolds with impunity. Instead, the district court clearly held, and we agree, that the language of the prime contract and of PYCA's subcontracts allowed PYCA to *alter* its agreement with Reynolds subject to an equitable adjustment. Such a reading is not error.

The record reflects that the District's reliance upon and calculation based on the Square D quote was reasonable under the circumstances.

As a related matter, PYCA contends that the unilateral adjustment by the District was made in bad faith because PYCA had begun to install the equipment on the assumption that the adjustment would be only $161, 180. The record, however, does not support this assertion. The underground electrical work began in April 1990 and, by January 1991, the project had already progressed to a point where the District could not revert to the previous design. Additionally, Foote and PYCA had clear notice that the $161,180 adjustment was only preliminary. On or about January 25, 1991, O&W advised Foote that the $161,180 figure was "the minimum true fair credit" for the proposed revisions and that O&W reserved the right to increase the credit further following review by the Corps of Engineers and the Mississippi Bureau of Pollution Control. On February 4, 1991, PYCA and Reynolds made an agreement that PYCA would not be liable to Reynolds for any amount in excess of the District's pricing. The fact that the ultimate adjustment by the District, in August 1991, did not comport with a private agreement between PYCA and Reynolds does not, standing alone, raise a genuine issue of material fact with regard to the District's alleged bad faith. Similarly, PYCA's contention that the District made the "maximum" adjustment possible based on the Square D quote does not demonstrate bad faith or that the adjustment was, in fact, inequitable.

Finally, the district court found that, to the extent that Foote and PYCA seek equitable relief based on delay, such claims lack merit. For example, Foote admits that on December 3, 1990, it ordered PYCA "not to proceed with any electrical work associated with the change order until the pricing of the equipment could be finalized." Foote also concedes that it did not order PYCA to proceed with the electrical work until January 28, 1991, and that PYCA did not begin this process

41

until on or about February 6, 1991. The District contends, and Foote does not show otherwise, that the resulting 65-day delay caused by the standoff was not authorized by any contractual provision. Astoundingly, Foote and PYCA argue that they, not the District, are entitled to damages. As observed previously by the district court, Foote was not permitted to "hold the project hostage" merely because Foote, PYCA, or Reynolds could not agree on the amount of the equitable adjustment.[36]

For the above reasons, the district court found, and we agree, that none of the claims submitted by PYCA or Foote warrants a further equitable adjustment or award of damages.

**VII**

The final issue remaining for our consideration is whether O&W is entitled to the protection of sovereign immunity enjoyed by the District. On October 3, 1994, the district court issued a Memorandum Opinion finding that PYCA's claims for punitive damages against the District should be dismissed but declining to extend the protection of sovereign immunity to the District. On November 8, 1994, the district court issued an order granting O&W's motion for clarification, holding that O&W, as the District's agent, was not liable to PYCA for punitive damages under the law of agency. Although the issue of O&W's derivative immunity on the punitive damages claim was

---

[36] Although it is not dispositive to the issues before us, we disagree with the district court that judicial review of this contract is of a limited nature. In making that determination, the district court sought to "[a]nalogiz[e] to federal contract cases" in observing that "the contractor must seek the relief provided for under the contract or be barred from any relief in the courts." Crown Coat Front Co. v. United States, 386 U.S. 503, 512 (1967). The Crown Coat Front case is inapposite to the dispute at bar. Crown Coat Front concerned the standard of review of actions by a federal administrative agency. See id. at 512-13 (noting that claimant must exhaust administrative remedies and that judicial review is restricted to a determination whether the agency's actions were arbitrary and capricious or unsupported by substantial evidence). Administrative law principles do not apply to this contractual dispute between a state and its private contractors.

not appealed to this court, we did consider and affirm, on interlocutory appeal, the district court's

ruling with regard to the District's exposure to punitive damages. At an early point in our analysis,

we held that "[a]s a political subdivision, the District is entitled to sovereign immunity from PYCA's

tort claims." PYCA I, 81 F.3d at 1420. We then dismissed the punitive damages appeal with respect

to Foote and O&W for want of appellate jurisdiction, noting at the time that this issue had not been

certified for appeal by the district court. See id. at 1421. On April 28, 1997, the district court held

that O&W is in fact entitled to sovereign immunity as the District's agent. Although we did not reach

the agency questions relative to O&W in PYCA I, we today find no factual or legal basis to determine

that O&W, as the District's agent, is outside the scope of immunity enjoyed by the District.

PYCA contends that O&W can be liable for its own acts even though the District may itself

have tort immunity. PYCA seeks in part to vindicate its position with an attempt to convince us that

O&W is not entitled to immunity because it is an independent contractor as opposed to an employee

of the District's, but we find that approach unpersuasive. Although some cases suggest that a

contractor's negligent performance of its duties might fall outside the scope of tort immunity, see,

e.g., McKay v. Boyd Constr. Co., 571 So.2d 916 (Miss. 1990); Wade v. Gray, 61 So. 168 (Miss.

1913); Envirologix Corp. v. City of Waukesha, 531 N.W.2d 357 (Wis. Ct. App. 1995), none of those

decisions addresses the situation presented by the case at bar, namely, whether an agent contractor

employed by a sovereign principal and bound to that principal by contract and regulation, enjoys the

same sovereign immunity.[37] We find the better course in the instant drama to be that a contractor is

---

[37] We note that the Envirologix opinion, while cited by PYCA for the principle that a project engineer as agent to a municipality could be liable to a subcontractor for tortious interference with contract, actually cuts against PYCA. In Envirologix, the Wisconsin Court of Appeals interpreted a portion of Wisconsin's sovereign immunity statute granting immunity to Volunteer Fire Departments and municipalities for the intentional torts of their officers, officials, and agents. See

43

not independently liable for alleged wrongs committed pursuant to instructions from the principal or in accordance with directions from a public representative to perform an essential part of the contract. As set forth below, the actions of the District and of O&W in this case were governed by various contractual documents and pertinent EPA regulations, and O&W's conduct was at all times within the range of actions contemplated by those documents and thus was protected.

PYCA contends that principles of agency do not shield O&W in this case. We disagree, primarily because such a conclusion ignores the hornbook agency principle that, if a principal cannot be held liable for performing an act, neither can the agent whom the principle directed to perform the act, even if the agent would have been liable in the absence of such privilege. In Wood v. Mississippi, 146 So.2d 546 (Miss. 1962), cited in both rulings by the district court on this subject, the Mississippi Supreme Court relied on the principle that "[a]n agent is not liable for torts committed by his principal personally; and if an act would not render the principal liable if done by him, under ordinary circumstances, an agent performing the act will not be liable." Id. at 551; cf. Vestal v. Oden, 500 So.2d 954, 957 (Miss. 1986) (same). The Wood Court also directed us to the Restatement of Agency, § 345: "An agent is privileged to do what otherwise would constitute a tort if his principal is privileged to have an agent do it and has authorized the agent to do it." Id. at 551-52. Although the facts in Wood differ from those in the instant case (namely in its distinction between statutory

_____

531 N.W.2d at 363. In construing the statute, the court observed that it extends agency protection only in instances involving "acts done in the exercise of legislative, quasi-legislative or judicial functions." Id. at 365. In that case, the court found that there was insufficient evidence to support an agency designation for the independent contractor at issue and remanded for additional proof. See id. at 366. We are not confronted with that situation in the instant case, since the district court found as a matter of law that O&W was the agent of the district; in any event, interpretation of Wisconsin statutes hardly sheds light on an entirely different—in form and substance—Mississippi legislative enactment.

44

privilege and sovereign immunity), we find that the same result applies to privileges as to immunities. By analogy, because O&W was operating within the scope of immunity granted to the District, we find that O&W likewise will be shielded by the same immunity.

This conclusion is demanded by recourse to the record in this case. Our review in this matter included the allegations of the complaint and other relevant evidence surrounding the principal-agent relationship between the District and O&W. PYCA's allegations, taken as a whole, repeatedly characterize the District as taking action jointly with and through its employee, O&W, with regard to the change order and the amount of credit due to the District. For example, PYCA alleges that O&W "was directed by the District to prepare the necessary drawings and cost breakdowns for the proposed changes." PYCA further alleges that "the District, through [O&W], improperly and illegally sought price quotations from additional electrical equipment manufacturers." PYCA contends that the district court ruled in its January 1994 opinion that "the controlling contract clauses in this case did not allow O&W to examine cost data of a supplier or to bid-shop the price of the equipment to ascertain the cost of the equipment to be used in calculating the amount of an equitable adjustment." Upon this premise, PYCA argues that O&W's actions were unlawful and outside the scope of tort liability enjoyed by the District.

PYCA's arguments are internally inconsistent and without merit; additionally, the thrust of their contention misapprehends the district court's earlier opinion. In the 1994 opinion, the district court ruled only that the model contract clauses do not *expressly* allow the District to examine a supplier's cost data or to bid-shop the price of equipment in ascertaining an equitable adjustment. The district court's first opinion reserved for further development the issue of the District's and O&W's tort immunity; it did not conclude that O&W's *actions* were improper or unlawful.

45

Moreover, and contrary to PYCA's argument, the district court never found that O&W acted illegally so as to remove from itself the shield of tort immunity, and we find no evidence to support such an interpretation of the district court's rulings. To the contrary, we find that PYCA's allegation that O&W acted illegally in seeking other price quotations in determining an equitable adjustment fails to show that O&W, as the District's agent, does not share in the District's immunity with regard to Count V.

Finally, we conclude that EPA regulations support the conclusion that O&W is entitled to the District's grant of immunity. PYCA does not dispute that 40 C.F.R. § 33.1030 was incorporated into its subcontract with Foote, and, in fact, PYCA invokes § 33.1030 by contending that the adjustment provided therein was not equitable. PYCA's argument that O&W acted illegally and outside the scope of immunity ignores the district court's separate finding that EPA regulations, incorporated by the contract, authorized the District (and its agents) to conduct investigations relevant to work changes, make unilateral determinations regarding work changes, and make any necessary equitable adjustments ultimately impacting PYCA through the flow-down provisions of the contract.

We therefore find that the EPA regulations impose affirmative obligations on both the District and O&W[38] and that O&W was entitled to summary judgment on the issue of sovereign immunity.

## CONCLUSION

---

[38] For good reason, the regulations are designed "to protect the public treasury from excessive expenditures." Evansville Cement Finishers, 766 F. Supp. at 695; see also J.A. Jones Const. Co. and Daidone Elec. Of New York, Inc. v. City of New York, 753 F. Supp. 497, 502 (S.D.N.Y. 1990). We addressed, in Part VI, *supra*, whether the actual adjustments were, in fact, "equitable" or instead beyond the scope of the contract. We find here simply that actions taken by O&W were within the scope of immunity enjoyed by the District.

46

For the foregoing reasons, we AFFIRM the judgment of the district court in all respects.[39]

---

[39] Foote's motion to dismiss Harrison County's appeal of the district court's October 1994 order is DENIED.